# Hay et al. v. City of Johnstown

Before McCann, P. J., and Griffith, J.

*Llewellyn E. Lloyd,* for plaintiffs.

*Spence, Custer, Saylor & Wolfe,* for intervenors.

*Elvin Teitelbaum,* for defendant.

..GRIFFITH J., February 16, 1953. — These bills in equity filed by physicians (June term, 1952, eq. dkt., no. 1), dentists (June term, 1952, eq. dkt., no. 2) and beauticians (June term, 1952, eq. dkt., no. 5) practicing in the City of Johnstown, all of whom pay some type of registration or license fee to the Commonwealth annually, seek to restrain the city from collecting from them the business privilege tax of 1½ mills on gross receipts provided for by city tax ordinance no. 2997 which was passed finally by the city council on February 11, 1952. The intervenors to the physicians' bill are professional engineers and professional architects who, likewise, have offices in the City of Johnstown.

The city ordinance was adopted under the powers given to municipalities by the Act of June 25, 1947, P. L. 1145, as amended by the Act of May 9, 1949, P. L. 898, 53 PS §2015.1 et seq., which authorizes political subdivisions to levy, asssess and collect taxes on persons, transactions, occupations, privileges, subjects and personal property, except where they now or hereafter "become subject to a *State tax or license fee.*" The act was held to be constitutional in English et al. v. Robinson Township School District et al., 358 Pa. 45, and on September 2, 1952, we found the city ordinance to be a valid exercise of the powers granted by the act in the case of Bennett et al. v. City of Johnstown et al., June term, 1952, eq. dkt., no. 7, 17 Cambria L. J. 1.

The bill of the beauticians entered to June term, 1952, eq. dkt., no. 5, was amended at the hearing to include schools of beauty culture. However, counsel for the city stated at the same hearing that the ordinance did not apply to schools of beauty culture and that no effort had been or would be made to collect the city business privilege tax from such schools. Consequently there is no issue before us in regard to the liability of schools of beauty culture under the ordinance.

It is the contention of the plaintiffs in all bills that they are exempt from payment of the city's business privilege tax by reason of the fact that they are "subject to a State tax or license fee."

In its answers, the city admits that plaintiffs pay the fees to the State for examination and registration as set forth in their respective bills, but it denies that such charges are true "license fees" within the meaning of the Act of 1947, supra, as amended, and that, therefore, plaintiffs are subject to the city's tax.

After due consideration of the evidence and briefs of counsel, we make the following

### Findings of Fact

1. Plaintiffs are physicians, dentists, professional engineers, architects or teachers of beauty culture or operators, owners or managers of beauty shops, each of whom have offices or places of business in the City of Johnstown.

2. When they commenced the practice of their professions, each of the plaintiffs paid to the Commonwealth a fee for examination and the issuance of their original license or certificate of qualification in the sum of $25; except in the case of the beauticians, who paid $5, if an owner, manager or teacher; $2, if an operator or manicurist, and $1, if a student or apprentice.

3. Each plaintiff pays to the Commonwealth an annual renewal or registration fee of from $1 to $5.

4. Defendant is a city of the third class under the laws of the Commonwealth of Pennsylvania.

5. Along with other municipalities, cities of the third class are authorized by the Act of June 25, 1947, P. L. 1145, 53 PS §2015.1 et seq., to levy, assess and collect taxes on persons, transactions, occupations, privileges, subjects and personal property excepting where they now or hereafter "become subject to a State tax or license fee . . .".

6. The Council of the City of Johnstown passed finally on February 11, 1952, ordinance no. 2997, which levied "a business privilege tax of one and one-half mills on the gross receipts derived from all services rendered to clients, patients and customers" on "all persons offering any service or services to the general public or a limited number thereof, from places, offices or establishments within the City of Johnstown who are not subject to a mercantile tax or a license tax under any other ordinance."

This ordinance became effective on March 15, 1952. A copy of this ordinance, marked "Plaintiffs' Exhibit 1" is attached to each bill of complaint.

7. Under the Medical Practice Act of June 3, 1911, P. L. 639, as amended, 63 PS §401 et seq., the fee "for each annual registration and for the certificate" is fixed at "one dollar or such other sum as may be fixed by the Department of Public Instruction." This fee is presently $1 and the examination fee is $25.

8. For the 1949-51 biennium, the total receipts of the State Board of Medical Examination and Licensure, including examination fees, were $96,531, and the expenses exclusive of rent, light, heat and legal services (except fees paid to Special Deputy Attorneys General assigned to specific equity cases, if any), were $70,037. In 1951, the receipts from 547 new certifi-

74

cations at $25 were $13,675, and from 15,987 renewals at $1, $15,987.

9. Under the Dental Law of May 1, 1933, P. L. 216, as amended, 63 PS §120, et seq., the fees for "examination and licensure" and for "annual registration" are to be fixed by the Department of Public Instruction. The examination fee is presently $25 and the annual registration fee $2.

10. For the 1949-51 biennium, the total receipts of the State Dental Council and Examination Board, including examination fees, were $47,618 and the expenses exclusive of rent, light, heat and legal services (except fees paid to Special Deputy Attorneys General assigned to specific equity cases, if any), were $39,971. In 1951, the receipts from 274 new certifications at $25 were $6,850, and from 7,377 renewals at $2, $14,754.

11. Under the Professional Engineers Registration Law of May 23, 1945, P. L. 913, 63 PS §148 et seq., the fees "for such examinations" and for "annual registration" are to be "fixed according to law". The examination fee is presently $25 and the annual registration fee $2.

12. For the 1949-51 biennium, the total receipts of the State Registration Board for Professional Engineers, including examination fees, were $56,822, and the expenses exclusive of rent, light, heat and legal services (except fees paid to Special Deputy Attorneys General assigned to specific equity cases, if any), were $64,312. There is no testimony as to the exact source of the receipts or of the number of new certifications or renewals, but the above mentioned sum of $56,822 includes receipts from all sources including both renewals and new registrations by examination, so that the proportion of the expenses covered by receipts from annual renewal fees may not be determined.

13. Under the act creating the State Board of Examiners of Architects, Act of July 12, 1919, P. L. 933,

as amended, 63 PS §21 et seq., applicants "for examination or certificate of qualification . . . shall pay a fee of twenty-five dollars". The fee "renewal of said certificate" shall be "in such amount as may be fixed by the board, not, however, in excess of ten dollars". The annual renewal of certificate fee is presently fixed at $4.00.

14. For the 1949-51 biennium, the total receipts of the State Board of Examiners of Architects, including examination fees, were $23,917, and the expenses exclusive of rent, light, heat and legal services (except fees paid to Special Deputy Attorneys General assigned to specific equity cases, if any), were $13,002. There is no testimony as to the exact source of the receipts or of the number of new certifications or renewals, but the above-mentioned sum of $23,917 includes receipts from all sources including both renewals and new registrations by examination, so that the proportion of the expenses covered by receipts from annual renewal fees may not be determined.

15. Under the Beauty Culture Act of May 3, 1933, P. L. 242, as amended, 63 PS §507, et seq., the "registration fees for the issuance of a license" are as follows: $5 for beauty shop owners, managers and teachers; $2 for operators and manicurists; $1 for students or apprentices, and $50 for Schools of Beauty Culture. The "annual renewal fees" are: $5 for shop owners and managers and school instructors; $2 for operators and manicurists, and $25 for schools of beauty culture. There is no renewal fee for students or apprentices.

16. For the 1949-51 biennium, the total receipts of the State Board of Cosmetology, including examination fees, were "in excess of disbursements", exclusive of rent, light, heat and legal services (except fees paid to Special Deputy Attorneys General assigned to specific equity cases, if any). But there is no testimony

as to the amount of the receipts or the expenses, so that the proportion of the expenses covered by receipts from annual renewal fees may not be determined.

17. It is only where a complaint is made that the State will act to enforce the law with respect to architects, physicians, dentists or engineers, and no inspections are made.

18. No charge is made against the various boards for their offices or for their light and heat.

19. Where a Special Deputy Attorney General is assigned to handle an equity case, his fee is charged against the board concerned. Otherwise, no charge is made for any legal services, all of which are paid for by the Department of Justice.

20. Receipts from examination and annual renewal fees are all paid into the General Fund of the State Treasury and are not designated for any special purpose.

21. There is no evidence that there is any relation between the amount of the appropriations to the Bureau of Professional Licensing and the receipts obtained from original license or certification fees and annual registration fees.

22. Cost accounting records on license functions are not kept by the State and the actual expense of issuing the licenses is unknown, so that the director of the bureau prorates the total costs among the various boards.

23. The annual fees paid by plaintiffs do not substantially reimburse the Commonwealth for its expenses in enforcing and administering the various statutes which impose the fees, but merely cover the clerical expense of registration and issuance of the license certificates.

## Discussion

Plaintiffs rely upon the case of Pittsburgh Milk Company v. Pittsburgh et al., 360 Pa. 360, in which

case it was decided that a milk dealer who pays a license fee pursuant to the provisions of the Milk Control Law of April 28, 1937, P. L. 417, 31 PS §700(j), as amended, was not subject to the payment of a tax imposed by an ordinance of a second class city enacted pursuant to the Act of May 29, 1947, P. L. 1145, supra. However in that case the State license fee paid by the milk dealers was a graded one, and varied according to the average quantity of milk received or produced by them daily. The minimum fee was $1 and the maximum $5,000, thus indicating that the fees were intended to reimburse the Commonwealth for the expense of supervision and regulation of the milk industry. Also in that case the Milk Control Commission by section 301 of the Act of 1937, supra, was given the power "to supervise, investigate and regulate the entire milk industry of this Commonwealth . . ." There is no such provision in any of the statutes creating the various professional boards of examination and licensure which issued certificates of registration to plaintiffs, with the exception of the Beauty Culture Act of 1945, P. L. 412, as amended, 63 PS §507, et seq., which act does permit the State Board of Cosmetology to prescribe sanitary rules. Moreover, in each of the statutes under which plaintiffs are licensed or certified the fees they pay are required to be deposited in the general fund of the State Treasury, and are not earmarked for the enforcement of the statutes. Under section 1101 of the Milk Control Law of 1937, supra, it is provided that "all monies . . . arising from license fees . . . be placed in a separate fund to be known as the 'Milk Control Funds'." This was also the case of Coca Cola Bottling Co. et al. v. City of Pittsburgh, decided in 1952 by the Court of Common Pleas of Allegheny County where the court was considering the Soft Drink Regulatory Act of May 14, 1925, P. L. 730,

31 PS §779, which provided that "such monies shall constitute a special fund and are hereby permanently appropriated to the Department of Agriculture for the purpose of enforcing the provisions of this Act."

In Armour and Company v. City of Pittsburgh et al., 363 Pa. 109, certain meat packers who were required to pay an annual fee of $10 under the Act of May 28, 1915, P. L. 587, as last amended by the Act of May 11, 1945, P. L. 454, contended that they were not subject to the annual mercantile license tax imposed by the City of Pittsburgh by city ordinance. The court said, page 113:

"It would be wholly absurd to suppose that the charge of ten dollars imposed by the 1945 Act was intended by the legislature to constitute a license fee in the sense thus indicated, especially in view of the tremendous size of the industry involved and the elaborate inspections which its regulation requires. On the contrary, the charge is obviously one designed to cover merely the clerical expense of registration and issuance of the license certificate. It is of the same nature as the $1.00 permit fee imposed by the Cigarette Tax Act of May 13, 1947, P. L. 215, as to which we said, in Rice Drug Co. v. Pittsburgh, 360 Pa. 240, 244, 61 A. 2d 878, 880, that 'clearly the imposition of this nominal charge was not intended to be an excise tax for the privilege of selling cigarettes'."

On the same page (113), the court repeated the definition of a license fee it had previously given in Pennsylvania Liquor Control Board v. Publicker Commercial Alcohol Company, 347 Pa. 555, 560, as follows:

" 'A license fee is a charge which is imposed by the sovereign, in the exercise of its police power, upon a person within its jurisdiction for the privilege of performing certain acts and which has for its purpose the defraying of the expense of the regulation of such acts for the benefit of the general public'."

The initial charge to be paid to the Commonwealth at the time an applicant submits to an examination is obviously not a "license fee" but an examination or registration fee, and is so denominated by the acts of assembly establishing the respective boards. The payment of such registration or examination fee clearly fails to bring plaintiffs within the exception contained in the Act of 1947, supra, as amended. It appears from the testimony that this initial fee is not returned to the applicant regardless of his success or failure in his examination. It is plainly an examination fee and not a license fee.

The annual renewal or registration fees paid by plaintiffs are as follows: Physicians, $1; dentists, $2; engineers, $2; architects, $4; beauty shop owners, managers or teachers, each $5; beauty shop operators or manicurists, each $2. On its face, the annual renewal fees, ranging from $1 to $5, paid by plaintiffs, are so small that they would appear to be registration fees and "designed to cover merely the clerical expense of registration and issuance of the license certificate": Armour & Co. v. Pittsburgh et al., supra.

By calling as their witness the Deputy Secretary of Public Instruction in charge of the Bureau of Professional Licensure, plaintiffs have sought to show that the fees paid by them cover a substantial part of the expenses of the various professional boards and that consequently they are true license fees within the meaning of the Act of 1947, supra. This witness testified that the total receipts of the State Board of Medical Examination and Licensure for the 1949-51 biennium amounted to $96,531, and that the expenses of this board amounted to $70,037. However, he also testified that there were but 15,987 renewals during the year 1951, which at the rate of $1 each would amount to $15,987, for one year, so that even from the figures

given it is readily apparent that the so-called "license fees" received annually from physicians do not cover a substantial portion of the expenses. Moreover, it appears from his testimony that no charge is made to the board or to the bureau for rent of offices, light, heat and legal services, except for fees paid to Special Deputy Attorneys General assigned to specific equity cases, if there are any.

During the same biennium the total receipts of the State Dental Council and Examination Board were $47,618, and the total expenses $39,971. However, in 1951 there were 7,377 renewal certificates issued at $2 apiece, making a total of $14,754 received by way of renewals. In this, as in all other instances, the amount of expenses given did not include the total expenses, but excluded rent, light, heat and legal services.

The total receipts of the State Registration Board for Professional Engineers for the same biennium amounted to $56,822, and the expenses were $64,312. Here, too, the expenses did not include rent, light, heat and legal services. There was no testimony as to the exact source of the receipts or the number of new certifications or renewals, so that the proportion of the expenses covered by receipts from annual renewal fees may not be determined.

For the same biennium the total receipts of the State Board of Examiners of Architects was $23,917, and the expenses $13,002. However the receipts of $23,917 include both renewal fees and examination fees so that the proportion of the expenses covered by receipts from annual renewals may not be determined.

The same witness testified that for the same biennium the total receipts of the State Board of Cosmetology were "in excess of disbursements". There was no testimony as to the amount of the receipts or

of the expenses, so that the proportion of expenses covered by receipts from annual renewal fees may not be determined. Also, in this case, the expenses which the witness testified were less than the receipts, did not include rent, light, heat and legal services.

It appears that the actual expenses of issuing the licenses is unknown because no cost accounting records on license functions are maintained, so that the director of the bureau merely prorates that portion of the total costs which he accounts for among the various boards, and there is no evidence that there is any relation between the amount of the appropriations to the Bureau of Professional Licensing and the receipts obtained from the original license or certification fees and the annual registration fees. From this testimony we are unable to find that the State is substantially reimbursed for the expenses of enforcing and administering such controls as it administers. On the contrary we believe that the fees received merely cover the clerical expense of registration and the issuance of the license certificate.

The business privilege tax exacted by the Council of the City of Johnstown is a tax on the privilege of practicing the various professions of plaintiffs. The State's charge of from $1 to $5 per annum is not graduated and is not imposed primarily for the purpose of permitting plaintiffs to engage in their professional activities, or in regulating such activities. It is imposed rather for the purpose of registering those qualified to the end that nonqualified and nonregistered persons may be prohibited from engaging in similar activities. Except in the case of those engaged in the practice of beauty culture, to whom some visits are made, no inspection, regulation or supervision of any sort is had, and no such "policing" of the professions is undertaken by the Commonwealth, as it under-

takes under the Milk Control Law of 1937, supra. It is only where a complaint is made charging that a licensed person is guilty of malpractice, or that a non-licensed person is engaged in a prohibited activity that the officers of the State boards will investigate. When the criminal statutes have been violated, as in the case of a physician charged with abortion, both the burden of investigation and prosecution is born by the local authorities. We believe that the certificates issued to plaintiffs by the State merely *permit* them to practice and do not regulate their activities. They are "licensed" in this limited sense only.

The purpose of the Professional Licensure Acts was not to regulate. There is no regulation except in a limited sense in the case of beauticians. The statutes restrict the practice of the various professions to those who are qualified and registered, but they do not regulate them in the performance of their duties. In order to be a true license fee a charge must have "for its purpose the defraying of the expense of the regulation of such Acts": Armour and Co. v. Pittsburgh et al., supra. We do not believe that the fees paid by plaintiffs have for their purpose the defraying of the expense of the regulation of their activities, because their activities are not regulated by the Commonwealth. Consequently, the fees paid by plaintiffs are not within the exemption provided for by the Act of 1947, supra, under the authority of which the city's ordinance was enacted. It is true that in the case of the Beauty Culture Act the Board of Cosmetology is authorized to issue the regulations as to sanitation, and in this sense beauticians are regulated. However, we are satisfied that in this case, as well as in the case of the other plaintiffs, the fees paid are nominal and cover only the approximate cost of registration and issuance of certificates, and "provisions exempting

persons and property from taxation" are to be "strictly construed": Statutory Construction Act of May 28, 1937, P. L. 1019, sec. 58(5), 46 PS §558.

The city, along with other municipalities, has been granted the right to tax because of the service and protection it provides to those who reside or work in the city. Plaintiffs receive the same protection as, for example, printers, lawyers, tailors, dressmakers and repairmen. Should they alone be relieved from the payment of the business privilege tax because they pay nominal fees of from $1 to $5 annually to the Commonwealth? We think the legislature intended no such result.

We therefore arrive at the following

### Conclusions of Law

1. The business privilege tax of the City of Johnstown is levied by virtue of the authority granted to municipalities under the Act of June 25, 1947, P. L. 1145, as amended, 53 PS §2015.1, et seq., which authorizes the political subdivisions to levy, assess and collect taxes on persons, transactions, occupations, privileges, subjects and personal property, except where they now or hereafter "become subject to a State tax or license fee."

2. Each of the plaintiffs has paid to the Commonwealth at the time of his application for examination an original charge or examination fee.

3. Each of the plaintiffs pays annually to the Commonwealth a renewal or registration fee for which he is issued a certificate of registration.

4. Neither the original examination fee nor the annual registration fee paid by plaintiffs is a "State tax or license fee" within the meaning of the exemption from taxation granted by the Act of 1947, supra.

We therefore enter the following

*Decree Nisi*

And now, February 16, 1953, at 10:45 a.m., after argument, and upon due consideration, it is ordered, adjudged and decreed as follows: That the bills brought by all plaintiffs be dismissed, at the cost of plaintiffs.

Unless exceptions are filed within 20 days after notice of the filing of this adjudication, this decree nisi shall be entered by the prothonotary as the final decree.