Commonwealth, Appellant, *v.* Eastern Motor Express, Inc.
Commonwealth, Appellant, *v.* Riss & Company, Inc.

280

Argued April 28, 1959. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN and BOK, JJ.

*Edward Friedman,* Deputy Attorney General, with him *Anne X. Alpern,* Attorney General, for appellant.

*Frank A. Sinon,* with him *F. Eugene Reader,* and *Rhoads, Sinon & Reader,* for appellees.

*Sanford D. Beecher,* and *Duane, Morris & Heckscher,* for amicus curiae.

*James M. Marsh* and *J. Harry LaBrum,* and *LaBrum and Doak,* for amici curiae.

OPINION BY MR. JUSTICE BELL, December 30, 1959:

These appeals were heard and will be considered together. The question involved may be thus stated: Is the tax imposed on each of these defendants by the Corporation Income Tax Law of 1951* valid and Constitutional. The lower Court held the Act to be unconstitutional.

The facts must necessarily be stated at length. We quote with approval the following excerpts from the able comprehensive opinion of President Judge NEELY:

"1. Eastern Motor Express, Inc. is an Indiana corporation having its principal office at Terre Haute, Indiana.

"2. Defendant is engaged in transporting property by motor vehicle as a common carrier, and is so engaged *exclusively in interstate commerce,*** pursuant to Certificates of Public Convenience and Necessity issued by the Interstate Commerce Commission. . . .

"3. Said defendant does not hold a certificate of authority to do business in the Commonwealth of Pennsylvania, nor does it employ or use capital or property in Pennsylvania in connection with any intrastate business.

"4. The defendant is not engaged in any intrastate commerce in the Commonwealth and it has no authority whatsoever to operate as a common carrier in intra-

---

* August 24, 1951 as amended December 27, 1951, P. L. 1763.
** Italics throughout, ours.

state commerce from the Pennsylvania Public Utility Commission.

"5. In 1951, the defendant handled interstate freight from points in Pennsylvania to points outside of the Commonwealth of Pennsylvania, interstate freight from points outside of the Commonwealth of Pennsylvania to points within the Commonwealth of Pennsylvania, and interstate freight by hauling the same through Pennsylvania from points in other states to points in still other states. All of said operations were conducted under Certificate of Public Convenience and Necessity issued by the Interstate Commerce Commission, as aforesaid.

"7. Defendant owns no real property which is located in or has a situs in the Commonwealth of Pennsylvania. The only tangible personal property that is ever present in Pennsylvania is that which is there in connection with the conduct of defendant's interstate transportation business.

"8. In 1951, the defendant owned 13 tractors, 3 straight trucks, 2 trailers, and 5 service cars, all located regularly and continuously in Pennsylvania. All these vehicles were used in the solicitation of business, and the pick-up or delivery of *interstate* freight in Pennsylvania to or from the defendant's terminals in Pennsylvania. Said vehicles are operated only in Pennsylvania and registered in Pennsylvania.

"9. The defendant has four [substantial] terminals in Pennsylvania located in Allentown, Harrisburg, Philadelphia and Pittsburgh. All of said terminals were leased from others and used by the defendant.

"11. The following employees of defendant performed all their duties at defendant's terminals in Pennsylvania, except as noted: Three Terminal Managers: . . . One Control Station Manager: . . . Two Office Managers: . . . Four Salesmen: These employees solicit freight from customers in Pennsylvania for points out-

side Pennsylvania. They also solicit freight from shippers outside Pennsylvania to customers inside Pennsylvania.

"Forty-three Office Clerks: These employees prepare and keep the records necessary in the movement of freight in *Interstate* Commerce. . . .

"Fifty-seven Dockmen: . . . Seventy-six City Pickup and Delivery Drivers: . . . Three Safety Control: . . . One Mechanic: . . .

"12. Defendant does not maintain any corporate meeting place within the Commonwealth of Pennsylvania, and its terminals in the Commonwealth of Pennsylvania are those inseparably related to its interstate transportation business, as aforesaid.

"13. Defendant has no employees in the Commonwealth of Pennsylvania other than those engaged in operations strictly connected with its *interstate* transportation business, as aforesaid.

"14. Defendant's gross receipts, in the sum of $2,348,430, in the Commonwealth of Pennsylvania are those from operations strictly connected with its interstate transportation business, as aforesaid.

"15. Defendant, being a foreign corporation engaged solely in interstate commerce in the Commonwealth of Pennsylvania does not pay the capital stock tax or franchise tax [or the Corporate Net Income tax].

. . .

"22. . . .

The defendant's tax return . . . disclosed that the application of the formula provided in Section 2 of the Corporation Income Tax Law determined a tangible property allocating percentage of 2.3324 percent; determined a wages and salaries allocating percentage of 20.2107 percent; and a gross receipts allocating percentage of 16.4300 percent, all for the purpose of allocating an average of 12.9910 percent of

defendant's net income to Pennsylvania for taxation. . . ."

The lower Court held that the Corporation Income Tax Law, as amended, in its application to each of these defendants was "invalid as being imposed on the defendants' privilege of engaging in interstate commerce . . . [and] is in violation of the Commerce Clause, Article I, Section 8, of the Federal Constitution, and therefore unconstitutional." Because of its aforesaid conclusion the lower Court did not consider or discuss several other important Constitutional questions raised by the taxpayers.

The lower Court based its decision on *Roy Stone Transfer Corporation v. Messner*, 377 Pa. 234, 103 A. 2d 700, and *Commonwealth v. Eastman Kodak Co.*, 385 Pa. 607, 124 A. 2d 100. In each of these cases this Court decided that the Corporation Income Tax Law of 1951 in its application to each of those cases was unconstitutional. In the *Roy Stone* case the taxpayer contended that the Corporation Income Tax Law imposed an excise tax, but that whether the tax was considered to be an excise tax or a property tax was immaterial since in either event it was unconstitutional. The Commonwealth, on the other hand, contended that the Act imposed a property tax, but admitted that if the Act imposed a tax on the privilege of engaging in interstate commerce it was unconstitutional under Article I, Section 8 of the Constitution of the United States.

The Corporation Income Tax Law of 1951 is a "catch-all" Act which seeks to impose (what it calls) a 5% property tax upon the net income of all corporations, domestic and foreign, derived from sources within this Commonwealth arising from the ownership of property in this Commonwealth, or the carrying on of activities within the Commonwealth.

The *Corporation Income Tax Law* of 1951 as amended was denominated by the Legislature "An ACT to provide revenue for State purposes by imposing a property tax . . . on the net income derived from sources within the Commonwealth of certain corporations. . . ." A "Corporation" was defined in §2 as follows: "A corporation having capital stock . . . *either organized under the laws of this Commonwealth,* the United States, *or any other state* . . . and carrying on activities in this Commonwealth, or owning property in this Commonwealth. . . ."

Section 3 pertinently provides: "Imposition of Tax.—Every corporation carrying on activities in this Commonwealth or owning property in this Commonwealth . . . shall pay a State *property tax* on net income derived from sources within this Commonwealth at the rate of five per centum per annum . . .: Provided, however, that such net income *shall not include income* for any period for which the corporation *is subject to taxation* under the Corporate Net Income Tax Act, approved the sixteenth day of May one thousand nine hundred thirty-five . . . as reenacted and amended.

"Except as otherwise provided in this section, the tax hereby imposed shall be in addition to all taxes now imposed on any corporation under the provisions of existing laws."

The *Corporate Net Income Tax* Act of May 16, 1935, P. L. 208, was reenacted and further amended on December 27, 1951, P. L. 1746. It reads: "An Act to provide revenue for State purposes by imposing *an excise tax* . . . on the net income of certain corporations . . ." The word "Corporation" was thus defined in Section 2: "A corporation having capital stock . . . either organized under the laws of this Commonwealth, the United States, or any other state . . . and doing

business in this Commonwealth, or having capital or property employed or used in this Commonwealth . . ."*

Section 3 provided:

"Imposition of Tax.—Every corporation . . . shall pay for the privilege of doing business in this Commonwealth . . . a State excise tax at the rate of five per centum per annum [for the years 1951, 1952 and 1953] . . . . The tax hereby imposed shall be in addition to all taxes now imposed on any corporation under the provision of existing laws."

Section 2 provided with respect to "Net Income" that in case the entire business of the corporation is transacted within this Commonwealth the net income shall be the net income for the calendar or fiscal year as returned to and ascertained by the Federal Government; and in case the *entire* business of any corporation *is not transacted within* this Commonwealth, the tax imposed by this Act shall be based upon such portion of the net income of such corporation as is determined by allocation and apportionments therein set forth.

The Act of 1935, as amended, taxed the net income of domestic corporations and also of foreign corporations which employed or used any property in Pennsylvania or carried on activities wholly within this Commonwealth, *or partly within and partly outside* of this Commonwealth. The Commonwealth, seeking desperately needed revenue, has drawn the Corporation Income Tax Law of 1951 so broadly and in some respects so confusedly that, as we shall see, it is exceptionally difficult to decipher the meaning of some of its important provisions. Notwithstanding the broad and at times confusing language of the Corporation Income Tax Law which was a catch-all Act intended to catch all possible taxable corporate income which was

---

* This was virtually identical with the provision in §2 of the Corporation Income Tax Law of 1951, supra.

not already taxed under the Corporate Net Income Tax Act, an analysis of all the provisions of the Corporation Income Tax Law convinces us that this Law was clearly intended and must be construed to cover, include and tax only foreign corporations which were engaged *solely* in *interstate* commerce in Pennsylvania and which employed property or carried on local activities in this Commonwealth in connection with interstate commerce.

The *Roy Stone* decision, upon which the lower Court and the taxpayer rely, held, as we have seen, that the Corporation Income Tax Law of 1951 was unconstitutional in its application to that taxpayer. In that case plaintiff, a foreign corporation, made deliveries by truck of interstate shipments to points within Pennsylvania and at times picked up property here for delivery outside of the Commonwealth. Plaintiff had no tangible or intangible property in Pennsylvania; no office or terminal was maintained in the Commonwealth; it paid no wages and had no payroll in Pennsylvania; and there were no employees of the plaintiff doing any kind of work in Pennsylvania except those engaged in operating plaintiff's trucks in interstate commerce. No contracts, orders or solicitations for the transportation of property of any kind were made or accepted within the Commonwealth and no payments for transportation or services rendered were received by the plaintiff in Pennsylvania. The difference in the facts in that case and in the instant case are considerable and material.

The *Roy Stone* case* reviewed and analyzed many decisions of the Supreme Court of the United States

---

* *Roy Stone* was followed and approved in *Commonwealth v. Eastman Kodak Co.*, 385 Pa. 607, 124 A. 2d 100, where the Commonwealth sought to impose a tax under the Corporation Income Tax Law upon Interstate Commerce where the local property or local activities were negligible and were an integral inseparable part of interstate commerce.

and several of this Court, and the basic principles laid down therein were confirmed (although on one point broadened) in the recent decisions of the Supreme Court in *Northwestern States Portland Cement Company v. Minnesota* and *Williams v. Stockham Valves & Fittings, Inc.,* 358 U.S. 450. In those cases, Mr. Justice CLARK, speaking for a sharply divided Court, said:

"These cases concern the constitutionality of *state net income tax laws** levying taxes on that portion of a foreign corporation's net income earned from and fairly apportioned to business activities within the taxing State *when those activities are exclusively in furtherance of interstate commerce.* . . . The Minnesota tax was upheld by its Supreme Court, 250 Minn. 32, while the Supreme Court of Georgia invalidated its statute as being violative of 'both the commerce and due process clauses of the Federal Constitution . . .' 213 Ga. 713. The importance of the question in the field of state taxation is indicated by the fact that thirty-five States impose *direct net income taxes* on corporations. . . It is contended that each of the state statutes, as applied, violates both the Due Process and the Commerce Clauses of the United States Constitution. *We conclude that net income from the subjected to state taxation provided the levy is not interstate operations of a foreign corporation may be discriminatory and is properly apportioned to local activities within the taxing State forming sufficient nexus to support the same.*

". . .One of four classes taxed by the statute is that of 'domestic and foreign corporations whose business within this state during the taxable year consists *exclusively* of foreign commerce, *interstate commerce,* or both.'

---

* Italics throughout, ours.

"Appellant's activities in Minnesota consisted of a regular and systematic course of solicitation of orders for the sale of its products, each order being subject to acceptance, filling and delivery by it from its plant at Mason City [Iowa]. . . . Forty-eight percent of appellant's entire sales were made in this manner to such dealers in Minnesota. For efficient handling of its activity in that State, appellant maintained in Minneapolis a leased sales office equipped with its own furniture and fixtures and under the supervision of an employee-salesman known as 'district manager.' Two salesmen, including this district manager, and a secretary occupied this three-room office. Two additional salesmen used it as a clearing house. Each employee was paid a straight salary by the appellant direct from Mason City and two cars were furnished by it for the salesmen. Appellant maintained no bank account in Minnesota, owned no real estate there, and warehoused no merchandise in the State. All sales were made on a delivered price basis fixed by the appellant in Mason City and no 'pick ups' were permitted at its plant there. The salesmen, however, were authorized to quote Minnesota customers a delivered price. Orders received by the salesmen or at the Minneapolis office were transmitted daily to appellant in Mason City, were approved there, and acknowledged directly to the purchaser with copies to the salesman.

". . . Salesmen would also receive and transmit claims against appellant for loss or damage in any shipments made by it, informing the company of the nature thereof and requesting instructions concerning the same.

. . .

"The respondent here [T. V. Williams, Commissioner v. Stockham Valves & Fittings, Inc.] is a Delaware Corporation with its principal office and plant in Birmingham, Alabama. It manufactures and sells

valves and pipe fittings through established local whole-salers and jobbers who handle products other than respondent's. These dealers were encouraged by respondent to carry a local inventory of its products by granting to those who did so a special price concession. However, the corporation maintained no warehouse or storage facilities in Georgia. It did maintain a sales-service office in Atlanta, which served five States. This office was headquarters for one salesman who devoted about one-third of his time to solicitation of orders in Georgia. He was paid on a salary plus commission basis while a full-time woman secretary employed there received a regular salary only. She was a 'source of information' for respondent's products, performed stenographic and clerical services and 'facilitated communications between the . . . home office in Birmingham, . . . the sales representative . . . and customers, prospective customers, contractors and users of [its] products.' Respondent's salesman carried on the usual sales activities, including regular solicitation, receipt and forwarding of orders to the Birmingham office and the promotion of business and good will for respondent. Orders were taken by him, as well as the sales-service office, subject to approval of the home office and were shipped from Birmingham direct to the customer on an 'f.o.b. warehouse' basis. Other than office equipment, supplies, advertising literature and the like, respondent had no property in Georgia, deposited no funds there and stored no merchandise in the State.

"Georgia levies a tax on net incomes 'received by every corporation, foreign or domestic, owning property or doing business in the state.' The Act defines the latter as including 'any activities or transactions' carried on within the State 'for the purpose of financial profit or gain' regardless of its connection with interstate commerce. To apportion net income, the Act

applies a three-factor ratio based on inventory, wages and gross receipts.

"That there is a *'need for clearing up the tangled underbrush of past cases'* with reference to the taxing power of the States is a concomitant to the negative approach resulting from a case-by-case resolution of 'the extremely limited restrictions that the Constitution places upon the states . . .' Wisconsin v. J. C. Penney Co., 311 U.S. 435, 445 (1940). . . . The resulting judicial application of constitutional principles to specific state statutes *leaves much room for controversy and confusion and little in the way of precise guides* to the States in the exercise of their indispensable power of taxation. This Court alone has handed down some three hundred full-dress opinions spread through slightly more than that number of our reports. As was said in Miller Bros. Co. v. Maryland, 347 U.S. 340, 344 (1954), the decisions have been 'not always clear . . . consistent or reconcilable. A few have been specifically overruled, while others no longer fully represent the present state of the law.' *From the quagmire there emerge, however, some firm peaks of decision which remain unquestioned.*

"It has long been established doctrine that the Commerce Clause gives exclusive power to the Congress to regulate interstate commerce, and its failure to act on the subject in the area of taxation nevertheless requires that interstate commerce shall be free from any direct restrictions or impositions by the States. Gibbons v. Ogden, 9 Wheat. 1 (1824). In keeping therewith a state 'cannot impose taxes upon persons passing through the state, or coming into it merely for a temporary purpose' such as itinerant drummers. Robbins v. Taxing District, 120 U.S. 489, 493-494 (1887). *Moreover, it is beyond dispute that a State may not lay a tax on the 'privilege' of engaging in interstate commerce,* Spector Motor Service v. O'Connor, 340 U. S.

602 (1951). Nor may a State impose *a tax which discriminates against interstate* commerce either by providing a direct commercial advantage to local business, Memphis Steam Laundry v. Stone, 342 U. S. 389 (1952); Nippert v. Richmond, 327 U. S. 416 (1946), *or by subjecting interstate commerce to the burden of 'multiple taxation,'* Michigan-Wisconsin Pipe Line Co. v. Calvert, 347 U. S. 157 (1954); Adams Mfg. Co. v. Storen, 304 U. S. 307 (1938). Such impositions have been stricken because the States, under the Commerce Clause, are not allowed 'one single-tax-worth of direct interference with the free flow of commerce.' Freeman v. Hewit, 329 U. S. 249, 256 (1946).

. . .

"Any doubt as to the validity of our position here was entirely dispelled four years after Beeler, in a unanimous per curiam in West Publishing Co. v. McColgan, 328 U. S. 823, citing the four cases of Beeler, U. S. Glue Co., both supra, Interstate Busses Corp. v. Blodgett, 276 U. S. 245 (1928) and International Shoe Co. v. Washington, 326 U. S. 310 (1945). The case involved the validity of California's tax on the apportioned net income of West Publishing Company, whose business was exclusively interstate. See 27 Cal. 2d 705.

" 'In relying on the foregoing cases for the proposition that a foreign corporation engaged within a state solely in interstate commerce is immune from net income taxation by that state, plaintiff [West Publishing Co.] overlooks the distinction made by the United States Supreme Court between a tax whose subject is the privilege of engaging in interstate commerce and a tax whose subject is the net income from such commerce. It is settled by decisions of the United States Supreme Court that *a tax on net income from interstate commerce, as distinguished from a tax on the privilege of engaging in interstate commerce,* does not conflict with

294

the commerce clause.' 27 Cal. 2d 705, 708-709. (Citations omitted.)

"We believe that the rationale of these cases, involving income levies by States, controls the issues here. The taxes are not regulations in any sense of that term. *Admittedly they do not discriminate against nor subject either corporation to an undue burden.* While it is true that a State may not erect a wall around its borders preventing commerce an entry, it is axiomatic that the founders did not intend to immunize such commerce from carrying its fair share of the costs of the state government in return for the benefits it derives from within the State. The levies are not privilege taxes based on the right to carry on business in the taxing State. The States are left to collect only through ordinary means. The tax, therefore, is 'not open to the objection that it compels the company to pay for the privilege of engaging in interstate commerce.' Underwood Typewriter Co. v. Chamberlain, supra, at 119. As was said in Wisconsin v. Minnesota Mining & Mfg. Co., 311 U. S. 452 (1940), 'it is too late in the day to find offense to that [commerce] Clause because a state tax is imposed on corporate net income of an interstate enterprise which is attributable to earnings within the taxing state . . .' Id., at 453.

"While the economic wisdom of state net income taxes is one of state policy not for our decision, one of the 'realities' raised by the parties is the possibility of a multiple burden resulting from the exactions in question. The answer is that none is shown to exist here. This is not an unapportioned tax which by its very nature makes interstate commerce bear more than its fair share. As was said in Central Greyhound Lines v. Mealey, 334 U. S. 653, 661 (1948), 'it is interstate commerce which the State is seeking to reach and . . . the real question [is] whether what the State is exact-

ing is a constitutionally fair demand by the State for that aspect of the interstate commerce to which the State bears a special relation.' . . .

"It is also contended that Spector Motor Service v. O'Connor, 340 U. S. 602 (1951), requires a contrary result. But there it was repeatedly emphasized that the tax was 'imposed upon the franchise of a foreign corporation for the privilege of doing business within the State. . . .' Thus, it was invalid under a long line of precedents, some of which we have mentioned. *It was not a levy on net income but an excise or tax placed on the franchise of a foreign corporation engaged 'exclusively' in interstate operations. . . .* The taxes here, like that in West Publishing Co. v. McColgan, supra, are based only upon the net profits earned in the taxing State. That incidence of the tax affords a valid 'constitutional channel' which the States have utilized to 'make interstate commerce pay its way.' In Spector the incidence was the privilege of doing business, and that avenue of approach had long been declared unavailable under the Commerce Clause. . . .

"Nor will the argument that the exactions contravene the Due Process Clause bear scrutiny. The taxes imposed are levied only on that portion of the taxpayer's net income which arises from its activities within the taxing State. These activities form a sufficient 'nexus between such a tax and transactions within a state for which the tax is an exaction.' Wisconsin v. J. C. Penney Co., supra, at 445."

The dissenting opinions differed sharply with the majority opinion and declared that the Court was in reality and for the first time approving a taxation of interstate commerce which had always theretofore been forbidden by the Constitution and by prior decisions of the Court.

As we understand the Northwestern States Portland Cement Company opinion, it greatly expanded the

prior interpretations of what are "local activities" which are taxable by a State even though a part of interstate commerce. From "the tangled underbrush of past [Supreme Court] cases" the broadened rule may, we believe, be thus stated: (1) A State cannot impose a tax on or for the privilege of engaging in interstate commerce; (2) A State can impose a property tax on the net income of a foreign corporation derived from property owned or used in the taxing State and/or from "local activities," broadly interpreted, even though the local activities are a part of interstate commerce, provided such net income is fairly and properly apportioned to the "local activities," and provided (a) the tax is not discriminatory against interstate commerce; and (b) the tax does not subject the interstate commerce to multiple State taxes; and (c) the tax does not constitute an undue burden on the interstate activities of the litigating taxpayer. Furthermore, it is valid and constitutional to measure such State tax by an apportioning formula provided the formula gives a fair and just and appropriate measurement* of the net income derived from "local activities" and/or property in the taxing State: *Northwestern State Portland Cement Company v. Minnesota* and *Williams v. Stockham Valves & Fittings, Inc.*, 358 U. S. supra; *Butler Brothers v. McColgan,* 315 U. S. 501; *Turco Paint and Varnish Co. v. Kalodner,* 320 Pa. 421, 184 A. 37. See also *Hans Rees' Sons v. North Carolina,* 283 U. S. 123.

In the light of *Northwestern States Portland Cement Company v. Minnesota* and *Williams v. Stockham Valves & Fittings, Inc.,* 358 U. S., supra, it is clear that the facts hereinabove set forth constituted a carrying

---

* Taxation is not a matter of exact science and absolute equality in taxation and perfect uniformity can rarely ever be attained: *Allentown School District Mercantile License Tax Case,* 370 Pa. 161, 170, 87 A. 2d 480, and cases cited therein.

on by these taxpayers of "local activities" in interstate commerce within Pennsylvania, and consequently Pennsylvania could constitutionally levy a property tax on the net income derived from such local activities.

Three questions remain: Did the formula which was prescribed in the 1951 Corporation Income Tax Law (1) discriminate against interstate commerce, or (2) subject the taxpayer's interstate commerce to multiple taxation, or (3) impose an undue burden on the interstate activities of this taxpayer?

With the Supreme Court's recent tests to guide us, we must further analyze the broad language of the Corporation Income Tax Law of 1951 and the formulae which it applies to corporations engaged exclusively in interstate commerce, keeping in mind at the same time that by its terms it does not apply to a corporation's income if that income is subject to the Corporate Net Income Tax Act. The latter purports to impose an excise tax, the former purports to impose a property tax on the net income derived from sources within the Commonwealth, i.e., from the ownership of property located or having a situs in this Commonwealth, or the carrying on of activities within the Commonwealth. However, while it is true that what a tax or an Act is called by the Legislature, is entitled to weight and is prima facie what it is, it is well settled that in the last analysis the nature of the tax depends not upon its label, but upon its incidence, i.e., its practical operation and effect: *Railway Express Agency, Inc. v. Virginia,* 347 U. S. 359; *Spector Motor Service, Inc. v. O'Connor,* 340 U. S. 602, 608; *Dawson v. Kentucky Distillers Co.,* 255 U. S. 288, 292; *Interstate Transit, Inc. v. Lindsey,* 283 U. S. 183, 190; *Memphis Steam Laundry v. Stone,* 342 U. S. 389; *Roy Stone Transfer Corp. v. Messner,* 377 Pa., supra; *Galveston H. & S. A. R. Co. v. Texas,* 210 U. S. 217, 227; *Lawrence v. State Tax Com-*

*mission,* 286 U. S. 276, 280; *Murray v. Phila.,* 364 Pa. 157, 71 A. 2d 280; *Armour & Co. v. Pittsburgh,* 363 Pa. 109, 112, 69 A. 2d 405; *Arrott's Estate,* 322 Pa. 367, 185 A. 697; *National Biscuit Co. v. Philadelphia,* 374 Pa. 604, 615, 98 A. 2d 182; *Commonwealth v. Eastman Kodak Company,* 385 Pa., supra.

The constitutionality of the Corporate Net Income Tax Act of May 16, 1935, as reenacted and amended, was sustained on the ground that it was a *property* tax on net income, in spite of the declaration in the Act that it was an excise tax :* *Blauner's Inc. v. Philadelphia,* 330 Pa. 342, 345, 198 A. 889; *National Biscuit Co. v. Philadelphia,* 374 Pa. 604, 612, 98 A. 2d 182; *Murray v. Philadelphia,* 364 Pa. 157, 169, 71 A. 2d 280; *Philadelphia v. Samuels,* 338 Pa. 321, 326, 12 A. 2d 79; see also to the same effect: *Kelley v. Kalodner,* 320 Pa. 180, 181 A. 598.

In the recent case of *Commonwealth v. Koppers Company, Inc.,* 397 Pa. 523, 156 A. 2d 328, the application and the constitutionality of the formula prescribed by the Corporate Net Income Tax Act was challenged and its constitutionality was sustained. That formula—to determine the taxable net income of corporations which were engaged in business which was

---

* The distinction between a property tax and a privilege or excise tax is sometimes so fine or so nebulous and the legislative Acts are sometimes so broadly or confusingly or overlappingly drawn, that the decisions throughout the entire Country on this vexing subject are at times vacillating, confusing and irreconcilable. Cf. *Commonwealth v. Curtis Publishing Company,* 363 Pa. 299, 69 A. 2d 410; *Turco Paint & Varnish Co. v. Kalodner,* 320 Pa. 421, 184 A. 37; *Commonwealth v. Warner Brothers,* 345 Pa. 270, 27 A. 2d 62; *Commonwealth v. Electrolux Corporation,* 362 Pa. 333, 67 A. 2d 105; *Commonwealth v. Bayuk Cigars Co.,* 345 Pa. 348, 28 A. 2d 134; *Commonwealth v. Columbia Gas & Electric Corporation,* 336 Pa. 209, 8 A. 2d 404; *National Biscuit Co. v. Philadelphia,* 374 Pa. 604, 612, 637, 98 A. 2d 182; see also *Commonwealth v. National Biscuit Co.,* 390 Pa. 642-5, 136 A. 2d 821.

partly intrastate and partly interstate, was determined and apportioned to Pennsylvania by the use of three fractions—(1) tangible property; (2) wages and salaries; and (3) gross receipts.*

The remainder of the corporate net income, after the inclusion or exclusion of capital gains, is divided into three equal parts. The first part is determined by taking 1/3rd of the value of the corporation's tangible property situated within this Commonwealth over the value of all the corporation's tangible property wherever situated. The next part is determined by taking 1/3rd of the expenditures of the corporation for wages, salaries, commissions and other compensation due to its employees assignable to this Commonwealth over the total expenditures of the corporation for the aforesaid compensation to all its employees. The remaining third is determined by taking 1/3rd of the amount of the taxpayer's gross receipts from business assignable to this Commonwealth over the amount of taxpayer's total gross receipts.

We note at this point that the aforesaid formula is virtually identical with the formula in the Corporation Income Tax Law. The Corporate Net Income Tax Act further provides:

"The amount assignable to this Commonwealth of expenditures of the corporation for wages, salaries, commissions, or other compensation to its employes, shall be such expenditures for the taxable year as represent the wages, salaries, commissions, or other compensation of employes (to the extent of services rendered or work performed in the Commonwealth and similar expenditures to employes),[1] *not chiefly* situated at, connected with, or sent out from, premises for

---

* Section 2.2.

[1] The language in parentheses are the words in the Corporation Income Tax Law; in all other material respects the language in the two Acts is identical.

the transaction of business maintained by the corporation *outside* the Commonwealth.

"The amount of the corporation's gross receipts from business assignable to this Commonwealth shall be, (1) the amount of its gross receipts for the taxable year (from services rendered, work and contracts performed and sales made, in the Commonwealth, and all other gross receipts)[2] except those negotiated or effected in behalf of the corporation by agents or agencies chiefly situated at, connected with, or sent out from, premises for the transaction of business maintained by the taxpayer *outside* of the Commonwealth, . . . .

"A rule shall not be deemed to be inapplicable merely because all the tangible property or the expenditures of a corporation for wages, salaries, commissions, or other compensation, or the gross receipts of the corporation are found to be situated, incurred or received without the Commonwealth."

Section 3 of the Corporate Net Income Tax Act then imposed on every corporation "for the privilege of doing business in this Commonwealth, or having capital or property employed or used in this Commonwealth, . . . a State excise tax at the rate of five per centum per annum [for the years 1951, 1952 and 1953] upon each dollar of net income of such corporation. . . ."

Section 3 of the Corporation Income Tax Law provides: "Every corporation carrying on activities in this Commonwealth or owning property in this Commonwealth . . . shall pay a State property tax on net income derived from sources within this Commonwealth [regardless of whether carried on in intrastate, interstate or foreign commerce] at the rate of five per centum per annum . . .; Provided, however, that such

---

[2] The language in parentheses are the words in the Corporation Income Tax Law; in all other material respects the language in the two Acts is identical.

net income shall not include income for any period for which the corporation is subject to taxation under the Corporate Net Income Tax Act . . . as reenacted and amended."

The Corporation Income Tax Law attempts to be all things to all men, and to catch and tax all net income which is not taxed under the Corporate Net Income Tax Act, and which in any possible way is subject to taxation by Pennsylvania.* While a State can tax intrastate commerce or commerce which is both intra and interstate in a way and to an extent which may be invalid or unconstitutional if applied to commerce which is solely interstate, it is clear that there is no material difference in the formulae set forth in each Act.

A taxpayer who attacks a formula of apportionment has the burden of clearly showing that it is invalid or unconstitutional: *Northwestern States Portland Cement Company v. Minnesota* and *Williams v. Stockham Valves and Fittings, Inc.,* 358 U. S., supra; *Butler Brothers v. McColgan,* 315 U. S., supra; *Commonwealth v. Bayuk Cigars, Inc.,* 345 Pa. 348, 359, 28 A. 2d 134. See also: *Norfolk & Western Railway Co. v. North Carolina ex rel. Maxwell,* 297 U. S. 682; *International Harvester Co. v. Evatt,* 329 U. S. 416.

The tax assessed by the Commonwealth against this taxpayer under the provisions of the Corporation Income Tax Law amounts to 12.99%. There is no clear proof by taxpayer that this tax imposes an undue burden on its interstate activities.

Taxpayer also contends that the formula discriminates against commerce which is solely interstate commerce. Notwithstanding the broad and sweeping lan-

---

* The Law is so sweepingly, conflictingly and confusedly drawn that it is not understood even by the able Deputy Attorney General who argued the case. For example, the Attorney General erroneously states in his brief: "A corporation may pay either tax."

guage of important provisions of the Corporation Income Tax Law, an analysis thereof convinces us that the law was intended to cover and actually does cover only those corporations which are engaged in Pennsylvania solely in interstate commerce, and then only to the extent of the net income therefrom which is derived from "local activities", even though such local activities are a part of interstate commerce. We believe the formula prescribed in the Corporation Income Tax Law fairly and properly apportions to "local activities" the net income derived from interstate commerce in which the taxpayer is engaged, and that there is no material difference between the formula in this Law and the formula prescribed in the Corporate Net Income Tax Act. For these reasons it is clear that this Law does not discriminate against interstate commerce.

Taxpayer's final contention is that this tax on interstate commerce subjects it to multiple taxation. All the net income which is taxed by Pennsylvania's Corporation Income Tax Law is unquestionably subject to taxation by the State in which these taxpayers are incorporated. We believe that it is also clear that just as in the case of a railroad or a pipe line, every State in which these taxpayers carry on local activities such as are performed in Pennsylvania while engaged in interstate commerce can levy a property tax identical with or similar to that levied by the Corporation Income Tax Law.

However, this contention of "multiple State taxation" is without merit in this case for the reason set forth by Mr. Justice CLARK in *Northwestern States Portland Cement Co. v. Minnesota,* supra: ". . . One of the 'realities' raised by the parties is the possibility of a multiple burden resulting from the exactions in question. The answer is that none is shown to exist here."

What we have heretofore said with respect to the validity, constitutionality and application of the Corporation Income Tax Law of 1951 to Eastern Motor Express, Inc., is equally applicable to Riss & Company, Inc.

The judgment in each case is reversed.

Mr. Justice MCBRIDE took no part in the consideration or decision of this case.

---

CONCURRING OPINION BY MR. JUSTICE COHEN:

The United States Supreme Court's decision in *Northwestern States Portland Cement Co. v. State of Minnesota* and *T. V. Williams, Commissioner v. Stockham Valves & Fittings, Inc.,* 358 U. S. 450 (1959) in both of which the Supreme Court concluded that ". . . net income from the interstate operations of a foreign corporation may be subjected to State taxation provided the levy is not discriminatory and is properly apportioned to local activities within the taxing State forming sufficient nexus to support the same" created so much concern and uncertainty that Congress passed Public Law 86-272: 73 Stat. 555 approved September 14, 1959 titled "An act relating to the power of the States to impose net income taxes on income derived from interstate commerce. . . ."

This Act of Congress in no way restricts the imposition of the tax as provided for by Pennsylvania's Corporation Income Tax Law of 1951, and, in fact, substantiates the majority's conclusion that the tax is both constitutional and applicable to the litigants in the instant cases.