Rieck-McJunkin Dairy Company et al. *v.* Pittsburgh School District et al., Appellants.

14

Argued March 25, 1949. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON and STEARNE, JJ.

*Oscar G. Peterson,* with him *Mortimer B. Lesher,* for appellants.

*Charles K. Robinson,* with him *Hamilton A. Robinson,* for appellees.

*C. Brewster Rhoads,* with him *Donald McDonald, Stephen T. Dean* and *Edward B. Soken,* for School District of Philadelphia, amicus curiæ.

OPINION BY MR. JUSTICE LINN, May 23, 1949:

Plaintiffs are milk dealers, within section 103 of the Milk Control Law approved April 28, 1937, P. L. 417, 31 PS 700j-101 et seq., engaged in business in the city

of Pittsburgh. They filed this class bill against the School District of Pittsburgh and its treasurer to restrain them from collecting mercantile taxes based on plaintiffs' respective sales of milk products. The defendants answered on the merits; after trial, the injunction was granted and this appeal by the school district followed.

The school district, by resolution of November 29, 1947, provided for the levy and collection of mercantile taxes for the fiscal year 1948 pursuant to the Act of June 20, 1947, P. L. 745, 24 PS 582.1 et seq., authorizing school districts of the first class to impose a "temporary mercantile license tax on persons engaging in certain occupations and businesses . . ." Section 3 requires "every person desiring . . . to engage in the business of wholesale or retail vendor of, or dealer in, goods, wares and merchandise . . . in a school district of the first class . . . [to] procure a mercantile license for his place of business . . . from the receiver of school taxes or school treasurer, who shall issue the same upon . . ." receiving specified license fees.

The first section, entitled "Definitions," contains the following provision of importance in this case: " 'Dealer in, or vendor of goods, wares and merchandise' shall not include any mechanic who keeps a store or warehouse at his place of manufactory or workshop in which he sells only his own manufactures, any person vending or disposing of articles of his own growth, produce or manufacture, or any hawker or peddler licensed under any law of this Commonwealth."

The court below held that plaintiff milk dealers are manufacturers of sixteen milk products and still drinks named in the third finding of fact as follows: Ice Cream and Frozen Specialties, Cottage Cheese, Butter, Skimmed Milk Powder, Condensed Skimmed Milk, Evaporated Milk, Orange and other Flavored Drinks, Pasteurized Cultured Buttermilk, Pasteurized Sour Cream,

Pasteurized Cream, Pasteurized Homogenized Cream, Pasteurized Chocolate Milk, Pasteurized Homogenized Milk, Pasteurized Homogenized Vitamin D. Milk, Pasteurized Milk, Pasteurized Skimmed Milk and Plain and Sweetened Condensed Milk. Having concluded that plaintiffs were manufacturers the court held that they were within the class excepted by the legislature from those whom the school district could tax.

In their brief, the plaintiffs refer to the fact that, in holding that they were engaged in manufacturing, the court dealt with only one of the three important words "growth, produce or manufacture" employed by the legislature in defining "dealer"; plaintiffs then make the further contention that they sell their "own . . . produce . . ." On the other hand, the argument for the school district was to the effect that the plaintiffs were mere dealers not engaged in selling their own "produce" nor engaged in "manufacture."

Counsel for the school district of Philadelphia (the only other first class school district in the Commonwealth) participated, amicus curiæ, in the argument and stated frankly that he regarded three of the seventeen products as manufactured products and therefore properly subject to the injunction granted; these three products are ice cream and frozen specialties, cottage cheese and butter; all the rest, he contended, were milk which plaintiffs purchased to sell again after subjecting it to incidental processes not constituting manufacture as understood in the Mercantile License Tax Act of 1947.

The three-fold classification into articles grown, produced, or manufactured has been in our mercantile tax statutes for more than a hundred years, and has frequently been the subject of judicial consideration: *In re Mercantile License Tax of Pittsburgh Coal Co.*, 77 Pa. Superior Ct. 93, 97 (1921). The court below eliminated the words "growth" and "produce" from the discussion, saying, "In using the term 'articles of his own growth,'

the legislature, it seems to us, intended to say that the farmer, who grew grain of any kind, or vegetables or hay, or any product of the soil, was exempt from the tax. In like manner, the farmer or poultryman, for example, who was engaged in the production of cattle or sheep or chickens or any kind of poultry might be said to be selling articles of his own produce although, of course, the eggs and other articles, which he might sell, were not produced entirely by his own efforts, but were dependent on other considerations in part. The word 'produce,' of course, may have a very general meaning such as the product of a factory or of an industry, but we doubt whether it was the intention of the legislature to so regard it in this particular taxing act, and if it were given this general definition there would be very little that would be left as subject to this taxing Act.

"The learned counsel for the plaintiffs argue that 'growth' includes the process, which takes place in milk when harmless bacteria of various kind, called cultures, are added to the milk to hasten what would otherwise take place through lapse of time. It does not seem to us that developments of this character such as for example would result from leaven or yeast being mixed with the meal means 'growth' as understood in this taxing act. This is merely a change of the chemical composition.

"It does not seem to us that either 'growth' or 'produce' as used in this Act in any way qualify or enlarge the last word, to wit, 'manufacture,' and that each one of these categories stands alone. If we are right in this conclusion, then our consideration for the remainder of the discussion may be confined to the meaning of the word 'manufacture.' " We agree with that conclusion as to the words "growth" and "produce."

We then come to the word "manufacture" as used in the statute. The definition of manufacturing given by

BLACK, J., in *Norris Brothers v. Commonwealth,* 27 Pa. 494, 496 (1856) has been frequently cited in the construction of statutes of this class. "But what is manufacturing? It is making. To *make* in the mechanical sense does not signify to create out of nothing; for that surpasses all human power. It does not often mean the production of a new article out of materials entirely raw. It generally consists in giving new shapes, new qualities, or new combinations to matter which has already gone through some other artificial process. A cunning worker in metals is the maker of the wares he fashions, though he did not dig the ore from the earth, or carry it through every subsequent stage of refinement. A shoemaker is none the less a manufacturer of shoes because he does not also tan the leather. A bureau is made by the cabinet-maker, though it consists in part of locks, knobs, and screws, bought ready made from a dealer in hardware." The court at page 495 said, "A dealer, in the popular, and therefore in the statutory, sense of the word, is not one who buys to keep, or makes to sell, but one who buys to sell again. He stands intermediately between the producer and the consumer, and depends for his profit, not upon the labour he bestows on his commodities, but upon the skill and foresight with which he watches the markets."

The word "manufacture" is to be taken as used by the legislature in its ordinary and general sense: compare *Com. v. Wark Co.,* 301 Pa. 150, 154, 151 A. 786 (1930). In considering the word we have the additional assistance of established judicial construction in case after case applying the word in taxing statutes familiar to the legislature. Cf. *Com. v. Pocono Mountain Ice Co.,* 23 Pa. Superior Ct. 267, 270 (1903).

In *Commonwealth v. Consolidated Dressed Beef Company,* 242 Pa. 163, 88 A. 975 (1913), it was held that the purchase and slaughter of livestock and resale of meat, hides, heads, horns, etc., was not manufacturing

within a provision exempting from a capital stock tax, despite cleaning, washing and sorting. *Commonwealth v. Consolidated Dressed Beef Co.,* 245 Pa. 605, 91 A. 1065 (1914) held that one who purchases cattle, slaughters them and sells the beef and other products to dealers in beef products was not engaged in manufacturing but was subject to a state mercantile tax. It was said that the defendant was engaged in "merchandising," buying for the sole purpose of selling again. The Court said at page 607, "[The defendant] buys cattle, which are for it the raw material, and it converts that material into forms and size suitable for the market which it supplies, and it then sells the material, as merchandise, to others who vend and deal at retail in the same products. . . . It subjects the material which it buys to certain manipulations, but those are not such as to properly constitute it a manufacturing corporation." The subject of meat processing was again considered in *Com. v. Weiland Packing Co.,* 292 Pa. 447, 141 A. 148 (1928). It appeared that the defendant sold pickled and dry salt pork, smoked hams and other processed meat products. The Court cited as adequate the following definition from 26 Cyc. 520, "Manufacturing is: (1) the application of labor or skill to material whereby the original article is changed to a new, different and useful article, provided the process is of a kind popularly regarded as manufacture or the product of such process." The court rejected the contention that hams, bacon and hides became manufactured products by the application of science, labor and skill to the raw materials. "We find that what is done preparatory to placing the meat on the market is to cut from the carcass of the slaughtered animal the parts popularly and generally designated as the 'hams,' and these are submitted for a time to a successive process of pickling or curing in solutions of nitrate of soda, sugar and water, thereafter encased in cotton covering and suspended for the period required in a

smokehouse over a fire of hickory wood. And what is the ultimate article when it emerges from this careful treatment, ready for sale to appellant's customers? Just what it was in form, in character and in substance when the treatment was begun on the original article—a ham, both as to designation and as to use. There has been injected into it salt solutions; otherwise, the original substance is there. There may be a change in coloration, but no special change in form or substance. The treatment given to this meat, instead of constituting a process of manufacture, is really an elaboration of the time-honored method of preparing and curing in the grimy little smokehouse of the farmer. From the moment of its separation from the carcass of the animal, the ham remains constantly intact, it retains practically its original shape and size, and neither the curing solution that is 'pumped' into it, nor the solution in which it is steeped, nor the chemical preparation with which it is 'scrubbed,' nor the ultimate 'smoking' applied to it, has done anything more in changing the original meat than to modify its color and taste and prevent deterioration and decay; and the purpose and use for which it was originally cut from the carcass as a ham is exactly the same,—to be used as food." See also *People ex rel. Meat Co. v. Roberts,* 155 N. Y. 408, 50 N. E. 53, 41 L. R. A. 228 (1898).

*Com. v. Lowry-Rodgers Co.,* 279 Pa. 361, 123 A. 855 (1924), held that cleaning coffee beans, removing their outer skins and roasting them was not manufacturing in the construction of the Philadelphia Mercantile Tax Law. The fact that roasting the beans changed their color, chemical composition and decreased weight by expelling moisture did not constitute manufacturing. Mr. Justice SIMPSON said that the manufacturing exemption did not cover "the case of merely cleaning and effecting a chemical change in a natural product, however skilful and beneficial the process and its results

may be, even though there also occurs an incidental change in the size, form and weight of that product." 279 Pa. at 368, 123 A. at 857. In *Com. v. Glendora Products Co.*, 297 Pa. 305, 146 A. 896 (1929), roasting coffee was held not manufacturing in a claim for exemption from capital stock tax.

Other instances of classifying parties as dealers subject to the tax, or as manufacturers exempt from the tax, might be referred to at length but shall be noted briefly. In the following cases exemption as manufacturer was disallowed: *Com. v. Sunbeam Water Co.*, 284 Pa. 180, 130 A. 405 (1925), distilling water for the purpose of removing impurities; *Com. v. Wark Co.*, 301 Pa. 150, 151 A. 786 (1930), contractor engaged in construction of buildings; *Com. v. John T. Dyer Quarry Co.*, 250 Pa. 589, 95 A. 797 (1915), quarrying and crushing stone; *Com. v. Welsh Mountain Mining and Kaolin Manufacturing Co.*, 265 Pa. 380, 108 A. 722 (1919), crushing and otherwise processing silica rock sold as silica sand; *Com. v. Paul W. Bounds Co.*, 316 Pa. 29, 173 A. 633 (1934), dressing limestone, blue stone and granite for use in interior walls of buildings. On the other hand, in *Com. v. McCrady-Rodgers Co.*, 316 Pa. 155, 174 A. 395 (1934), exemption as a manufacturer of ready mixed concrete was allowed, the court holding that the product becomes artificial stone, a new product composed of sand, gravel and cement; in *Com. v. Peerless Paper Specialty, Inc.*, 344 Pa. 283, 25 A. 2d 323 (1942), exemption from mercantile license tax was allowed a manufacturer of adhesive paper, sealing tape and kindred products. It was said that "paper and glue are converted into sealing tape, a new and different article which has totally different uses." In *Com. v. Snyder's Bakery*, 348 Pa. 308, 35 A. 2d 260 (1944) it was held that making potato chips from raw potatoes, hot fat, vegetable oils and salt was manufacturing, resulting in a product adapted to entirely different use

from the raw potato, the form and content of the finished product being entirely different.

While it may be difficult from these decisions to state a definition that will in all cases readily determine whether a party should be classed as a dealer, i.e., one who buys to sell, or as a manufacturer, i.e., one who makes a new product, we have no difficulty in classifying plaintiffs as dealers who buy milk, bought for the purpose of selling it as milk after subjecting it to various processes, and also in classifying them as manufacturers, making ice cream, cottage cheese or butter. While these articles are made from milk, they are "a new and different article" from the milk originally purchased, within the principal controlling decisions cited above. With respect to ice cream, the court below referred to the Ice Cream Regulatory Act of 1933,[1] in which ice cream is treated by the legislature as a manufactured product, but a like inference with respect to milk generally cannot be made from the Milk Control Act of 1935,[2] because the phraseology of that Act deals with both processor and manufacturer.

It would unnecessarily lengthen this opinion to deal seriatim with each of the remaining fourteen products in the sale of which the plaintiffs are dealers and not manufacturers. All the evidence was produced by the plaintiffs; the defendants produced none. The chancellor made no findings of fact with respect to the processes applied to produce these fourteen products which plaintiffs sold. As the evidence came from them and is not contradicted by evidence offered by defendants, we shall deal with it as if the chancellor had made specific findings in accord with plaintiffs' evidence. We shall refer briefly to a few of them. A city ordinance of Pittsburgh requires pasteurization. Pasteurized milk

---

[1] Act of May 31, 1933, P. L. 1116, 31 PS 397 et seq.

[2] Act of July 2, 1935, P. L. 589, 31 PS 645 et seq.

was described at some length by two witnesses. Pasteurization involves heating milk to a certain temperature and holding it at that temperature for a specified length of time for the purpose of destroying disease producing organisms. The process results in changes in its protein and mineral content. The mere fact that plaintiffs do this on a large scale with expensive machinery does not make it any the less processing milk. In *City of Louisville v. Ewing Von-Allmen Dairy Co.,* 268 Ky. 652, 105 S. W. 2d 801 (1937), and in *N. Y. ex rel Empire State Dairy Co. v. Sohmer,* 218 N. Y. 199, 112 N. E. 755, L. R. A. 1917A 48 (1916), in construing statutes exempting machinery used in manufacturing, the courts held that pasteurization of milk was mere processing and not manufacturing. Homogenization breaks up globules of fat to prevent separation of cream from milk and results in uniform distribution of the fat content of the milk. Milk is homogenized by forcing it through small openings at pressures from 2500 to 4000 pounds per square inch. While some of the attributes of milk are changed by the process it is not manufacturing into a new and different article. It also continues to be sold as milk. Pasteurized and homogenized vitamin D milk and pasteurized chocolate milk are milk with the addition, in one instance, of vitamin D concentrate and, in the other, of chocolate and sugar. Condensed, evaporated and powdered milks are produced by boiling off, under controlled conditions, a portion of the water content of the milk; this is a variation of the process of reducing a raw material to its constituent parts for purposes of distribution. Buttermilk and sour cream are produced by inoculating milk or cream with a pure culture of lactic organisms which at proper temperatures and for a controlled incubation period will grow and propagate. These products are sold as milk; the changes are essentially in the milk flavor, they are still used as beverages and are not new and different products in the sense

of the definition of manufacture. What is said of these products may, in general, be said of the others excepting the three which we agree are manufactured.

In a supplemental brief, the plaintiffs refer to *Wisconsin Electric Power Co. v. U. S.*, 336 U. S. 176, 69 S. Ct. 492, 93 L. Ed. 463 (1948) a case in which at page 185 the court speaks of pasteurizing as processing, and to *Village of North College Hill v. Woebkenberg*, 59 Ohio App. 458, 18 N. E. 2d 614 (1938). The decision in the *Wisconsin Electric* case was "that electrical energy supplied to these dairy plants through single meters, or through more than one but without differentiation as to use, is energy sold for commercial consumption." That decision sheds no light on the legislative meaning intended by our legislature in the mercantile tax law of 1947. In the Ohio case, a town ordinance, requiring a license to engage in the business of "peddling and dealing in milk" was held in conflict with a statute prohibiting municipalities from requiring "of the owner of any product of his own raising, or the manufacturer of any article manufactured by him" a license to sell "in any way, by himself or agent, any such article or product." The agent of a dairy company was fined in a mayor's court for peddling its products without a license. The conviction was set aside. After reciting that the dairy company pasteurized milk purchased from farmers the court continued "The dairy company also sells by-products which it manufactures, such as cottage cheese, buttermilk and pure butter fat. The dairy company has its pasteurization vats, machinery for straining the milk, machinery for bottling the milk, and machinery for cleansing the bottles. It is undisputed that this machinery is extensive and expensive in its operation. It is further undisputed that in preparing the milk for sale, it requires the operation of all these machines. This certainly comprehends more than

a mere dealing in a raw product. . . . It would seem that these facts clearly establish that the defendant's employer is a manufacturer." While we have reached the same conclusion as respects ice cream, cottage cheese and butter, we cannot regard what the Ohio court says of pasteurization as affecting the meaning of "manufacture" established by the long line of our cases expressly dealing with the word in our taxing statutes.

Decree reversed in part; record remitted with instructions to enter a decree not inconsistent with this opinion, costs to be equally divided between the plaintiffs on the one side and the defendant school district on the other.