Armour and Company, Appellant, *v.* Pittsburgh et al., Appellants.

Argued October 4, 1949. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*J. Frank McKenna, Jr.,* Assistant City Solicitor, with him *Anne X. Alpern,* City Solicitor, for defendants, City of Pittsburgh et al.

*John E. Evans, Sr.,* with him *Samuel A. Lichter* and *Evans, Ivory & Evans,* for plaintiffs, Denholm Packing

Company, John Foertsch Company and Oswald & Hess Company.

*Clyde A. Armstrong*, with him *William C. O'Neil, Frederick B. Baird, Louis R. Miller* and *Thorp, Bostwick, Reed & Armstrong*, for plaintiff, Armour & Company.

*Oscar G. Peterson*, Assistant Solicitor, with him *Mortimer B. Lesher*, Solicitor, for School District of Pittsburgh.

*C. Brewster Rhoads*, with him *Donald McDonald, Stephen T. Dean* and *Edward B. Soken*, for School District of Philadelphia, amicus curiæ.

OPINION BY MR. JUSTICE HORACE STERN, November 14, 1949:

The question is the extent to which certain meat-packing establishments in Allegheny County are subject to mercantile license taxes levied by the City of Pittsburgh and the School District of Pittsburgh for the year 1948.

The Act of June 25, 1947, P. L. 1145, gave authority to cities of the second class A and certain other political subdivisions to levy such taxes on persons, transactions, occupations, privileges, subjects and personal property within their limits as they should determine, but not on a privilege, transaction, subject, occupation or personal property which then was, or should thereafter become, subject to a State tax or license fee. In pursuance of this authority the City of Pittsburgh, on December 1, 1947, enacted an ordinance imposing annual mercantile license taxes upon persons engaged in certain occupations and businesses at the rate of one mill on each dollar of the volume of the annual gross business transacted by wholesale vendors and dealers and two mills in

the case of retail vendors and dealers; the terms "dealer" and "vendor" were not to include, however, persons vending articles of their own growth, production or manufacture thereof. The validity of this ordinance was upheld in *Federal Drug Co. v. Pittsburgh,* 358 Pa. 454, 57 A. 2d 849. The packers claim they are not liable for the payment of this tax because they are required, under the Act of May 28, 1915, P. L. 587, as amended by the Acts of June 21, 1939, P. L. 656, and May 11, 1945, P. L. 454, to pay, for each establishment operated by them, an annual fee of $10 at the time they apply "for registration and license." The 1945 Act, which imposed this charge, made it unlawful for any person to operate such an establishment unless it was duly licensed in accordance with the provisions of the Act.

The Act of June 20, 1947, P. L. 745, imposed upon wholesale and retail vendors and dealers in school districts of the first class (of which the School District of Pittsburgh is one) a mercantile license tax at the rate of one-half mill on each dollar of the volume of the annual gross business transacted by wholesale vendors and dealers and one mill in the case of retail vendors and dealers; the terms "dealer" and "vendor" were not to include, however, persons vending articles of their own growth, produce or manufacture.

The court below sustained the packers' claim to exemption from the City tax because of their payment to the Department of Agriculture of the annual fee of $10. We are not in accord with that conclusion. The mere name that may be given in a statute to a tax or a license fee is not determinative of its real nature, and we do not believe that the $10 fee prescribed in the Act of May 11, 1945, P. L. 454, to accompany the application "for registration and license" is a true "license fee" within the meaning of that term as employed in the Act of June 25, 1947, P. L. 1145. A license fee is one exacted for the purpose of regulating an occupation or privilege which

is deemed to be in need of public control, and, ordinarily, it is designed for the sole purpose of reimbursing the sovereign, in whole or in part, for the necessary expense of enforcing and administering such control; if it exceeded the amount required for that purpose it would become a tax for revenue and cease to be a valid license fee. "A license fee is a charge which is imposed by the sovereign, in the exercise of its police power, upon a person within its jurisdiction for the privilege of performing certain acts and which has for its purpose the defraying of the expense of the regulation of such acts for the benefit of the general public": *Pennsylvania Liquor Control Board v. Publicker Commercial Alcohol Co.,* 347 Pa. 555, 560, 32 A. 2d 914, 917. It would be wholly absurd to suppose that the charge of $10 imposed by the 1945 Act was intended by the legislature to constitute a license fee in the sense thus indicated, especially in view of the tremendous size of the industry involved and the elaborate inspections which its regulation requires. On the contrary, the charge is obviously one designed to cover merely the clerical expense of registration and issuance of the license certificate. It is of the same nature as the $1 permit fee imposed by the Cigarette Tax Act of May 13, 1947, P. L. 215, as to which we said, in *Rice Drug Co. v. Pittsburgh,* 360 Pa. 240, 244, 61 A. 2d 878, 880, that "Clearly the imposition of this nominal charge was not intended to be an excise tax for the privilege of selling cigarettes." It is of the same nature also as of the annual fee of $2 for a mercantile license prescribed in section 3 of the Act of June 20, 1947, P. L. 745, imposing a mercantile license tax in school districts of the first class; that fee was to be paid to the receiver of school taxes or school treasurer, who was to issue the license upon receiving such payment. The fee provided for in the Milk Control Law of April 28, 1937, P. L. 417, was a *real* license fee, as we held in *Pittsburgh Milk Co. v. Pittsburgh,* 360 Pa. 360, 62 A. 2d

49, 52, which is the case relied upon by the packers; that fee was a graded one imposed upon milk dealers according to the average quantity of milk daily received or produced by them, ranging from a minimum of $1 to a maximum of $5,000, thus indicating that it was intended by way of reimbursement for the expense of supervision and regulation of the milk industry, the burden being placed upon the dealers in the proportions in which the magnitude of their respective business operations required such supervision. The charge here in question is wholly different from the license fee thus exacted of the milk dealers, and we are clearly of opinion that the meat-packers are not entitled to exemption from the City of Pittsburgh mercantile license tax merely because of their $10 payments to the Department of Agriculture. Their liability under the City tax is in all respects the same as under the tax of the School District.

We come, then, to the question as to which of the operations carried on by these meat-packers are in the nature of manufacturing and therefore excluded from liability for the tax both under the ordinance of the City of Pittsburgh and under the Act imposing the mercantile license tax in school districts of the first class. The City ordinance exempts persons who vend articles "of their own growth, production or manufacture," the Act imposing the school district tax exempts persons who vend articles "of their own growth, produce or manufacture." The words "production" and "produce" were undoubtedly intended to have the same meaning, and it was held in *Rieck-McJunkin Dairy Co. v. Pittsburgh School District*, 362 Pa. 13, 66 A. 2d 295, that neither the word "growth" nor the word "produce" as used in the Act qualified or enlarged the word "manufacture"; here, therefore, as in that case, our discussion may be confined to the import and application of the word "manufacture".

The court below held that certain articles produced by the packers were manufactured,—a ruling not contested by the City or by the School District; the items so characterized are soap, soap chips, soap flakes, bar soap, liquid soap, glue, sandpaper, cosmetics, animal shortening, vegetable shortening, oleomargarine, sausages, luncheon meats, liverwurst, puddings, bologna, glycerin, feed meal, fertilizer, butter, cheese, and ice cream.

The following items were held by the court *not* to be manufactured articles:—the principal cuts of meat, such as (in the case of hogs) hams (including boiled and baked hams), feet, backs, bacon, sides, butts, loins, spare ribs, and bellies, and the corresponding cuts from cattle, sheep and calves, also milk and milk products except cottage cheese, butter, and ice cream. The packers appeal from that ruling, but their attack upon it is unjustified. Of the animal carcasses handled in their establishments some, after being skinned and de-haired, are merely halved or quartered and then refrigerated for the purpose of preservation until sold as fresh, unprocessed meat,—beef, mutton, lamb or veal, as the case may be. Others are cut up into their various parts and the different portions subjected to such operations as cleaning, drying, pickling, salting, smoking, boiling, baking and the like,—all in order to prepare them for the market but without causing any appreciable alteration in their sizes, forms, textures, substance or composition. Such treatments do not constitute manufacturing as that term has been construed in repeated decisions of this Court, but are merely processing operations analogous to the milling of grain, the spinning of cotton, or the pasteurizing and homogenizing of milk; curing meat consists merely of drying, salting and smoking it in order to keep it indefinitely in an edible condition and impart to it a desired flavor; it is "the perma-

nent halting . . . of the destructive processes of nature": *Commonwealth v. Clark*, 344 Pa. 155, 157, 25 A. 2d 143, 144. It was said in *Commonwealth v. Weiland Packing Co.*, 292 Pa. 447, 450, 451, 141 A. 148, 149, that "the process of manufacture brings about the production of some new article by the application of skill and labor to the original substance or material out of which such new product emerges. If however there is merely a superficial change in the original materials or substances and no substantial and well signalized transformation in form, qualities and adaptability in use, quite different from the originals, it cannot properly and with reason be held that a new article or object has emerged,—a new production been created." Nor is it of legal significance in this connection that the operations thus conducted require large and extensive plants and organizations, trained men and intricate machinery, for even though the labor be skilled, the operations delicate, a large plant involved, and expensive machinery utilized, such factors, neither individually nor collectively, convert what is essentially a mere processing operation into a manufacturing one: cf. *Rieck-McJunkin Dairy Co. v. Pittsburgh School District*, 362 Pa. 13, 23, 66 A. 2d 295, 299.

In *Commonwealth v. Consolidated Dressed Beef Co.*, 242 Pa. 163, 88 A. 975, the company slaughtered livestock, took the hides, heads, horns, hoofs, tails and entrails from the dead animals, cleaned and sorted them, washed and halved the carcasses, refrigerated each part, and subsequently cut them into quarters or smaller portions for purposes of sale; it was held that in conducting these operations it was not engaged in manufacturing. To the same effect was the decision in *Commonwealth v. Consolidated Dressed Beef Co.*, 245 Pa. 605, 91 A. 1065. In *Commonwealth v. Weiland Packing Co.*, 292 Pa. 447, 141 A. 148, it was held that hams, bacon, pickled meat and hides were not manu-

factured products. It was there said (pp. 452, 453, A. p. 150) : "From the moment of its separation from the carcass of the animal, the ham remains constantly intact, it retains practically its original shape and size, and neither the curing solution that is 'pumped' into it, nor the solution in which it is steeped, nor the chemical preparation with which it is 'scrubbed', nor the ultimate 'smoking' applied to it, has done anything more in changing the original meat than to modify its color and taste and prevent deterioration and decay; and the purpose and use for which it was originally cut from the carcass as a ham is exactly the same,—to be used as food. In like manner, the recital in the case stated of the methods by which bacon and pickled and dry salt pork are treated to prepare and cure them for the market comprises a similar use of solutions and final smoking; and, in the matter of skins taken from the animals, these are scraped and soaked in salt, remaining what they were originally,—untanned skins. The methods, labor and skill which actual manufacturing requires are here wholly absent. We find no application of labor or skill whereby the original article has been changed to a new and different substance to be put to a use not intended for the original."

There are four articles which the court below held to be manufactured products and which are the subject of appeals by the City and the School District, namely, lard, tallow, grease, and hides; its ruling that ice is "manufactured" is also questioned. In our opinion, none of these products is a manufactured article. *Lard* is hog fat cooked in tanks under steam pressure whereby the rendered fats are drawn off to the top and separated from the water and other residue; it is then refined, bleached, mixed with a preservative ingredient, textured and packaged; sometimes it is also hydrogenated. In *Commonwealth v. Fried & Reineman Packing Co.,* 330 Pa. 124, 198 A. 801, it was held that the production

of lard consists of processing and curing operations.* What has been said of lard applies also to *tallow* and *grease*, tallow being obtained from the fats of cattle and sheep; it is liquefied by rendering, and, after solidification, is classified into different grades, mainly according to color. As to *hides*, it has already been pointed out that in *Commonwealth v. Consolidated Dressed Beef Co.*, 242 Pa. 163, 88 A. 975, and in *Commonwealth v. Weiland Packing Co.*, 292 Pa. 447, 141 A. 148, they were held not to be manufactured products; all that the packers do to the animal skins is to wash, de-hair, cure and grade them. As to *ice*, the process employed is to freeze water in a tank that has brine in it, the brine being chilled by ammonia contained in the coils that run through the tank. The distilling of water has been held not to be manufacturing (*Commonwealth v. Sunbeam Water Co.*, 284 Pa. 180, 130 A. 405) and, by the same token, the mere freezing of water and converting it into ice cannot be said to be manufacturing. We are of opinion, therefore, as to the five items thus discussed, that the court below erred in holding them to be manufactured products.

In Appeal No. 224, March Term, 1949, the decree is reversed and the bill dismissed at appellant's costs. In all the other appeals here involved the decrees are reversed in part and the record is remitted with instructions to enter decrees not inconsistent with this opinion; costs to be equally divided between the packers on the one side and the City and School District on the other.

---

* In *Commonwealth v. Consolidated Dressed Beef Co.*, 242 Pa. 163, 165, 88 A. 975, 976, it was said that the making of hams and lard was manufacturing, but this was merely dictum; the appeal in that case was by the company and not by the Commonwealth, so the question was not raised.