## Commonwealth v. Hardes Lumber Corp.

*Anne X. Alpern,* Attorney General and *N. David Rahal,* Deputy Attorney General, for Commonwealth.

*Robert L. Rubendall,* of *Hull, Leiby & Metzger* for defendant.

NEELY, P. J., July 24, 1961.—Defendant has appealed from the decision of the Board of Finance and Revenue with respect to its capital stock tax for the fiscal year ending June 30, 1959. Defendant's business consists of cutting timber, transporting it to its sawmill where it is cut into boards of varying lengths, then stored, dried and sold to manufacturers. In its capital stock tax report defendant claimed the manufacturer's exemption under the Capital Stock Tax Act of June 1, 1889, P. L. 420, sec. 21, as amended, 72 PS §1871, and by the use of an apportionment formula submitted in its report a taxable value of capital stock in the amount of $8,900.22 and computed its tax liability as $44.50.

On October 13, 1959, the Department of Revenue made, and on October 22, 1959, the Department of the Auditor General approved, a settlement of defendant's capital stock tax for the year ended June 30, 1959 in

the amount of $580.72, based upon defendant's appraised value of its capital stock in the amount of $116,144 without the allowance of any exemption. A petition for resettlement was filed with the Department of Revenue and this petition was refused on July 25, 1960; defendant filed a petition for review with the Board of Finance and Revenue, which petition was refused by the board's order dated October 25, 1960; whereupon on December 5, 1960, defendant filed in this court its appeal with its specification of objections. These objections raise but one question, viz., whether defendant was entitled to the manufacturer's exemption.

The parties have agreed that if defendant's entire operation constitutes manufacturing, then the tax liability is $44.50; if its sawmill operation is manufacturing but its timber operation is not, then the tax liability is $76.42. These figures are based on the use of allocation fractions by which the parties tentatively arrived at the proportion of defendant's taxable assets. It was stipulated that "should (it) be finally determined that the defendant's operations do not constitute 'manufacturing' ", defendant's tax liability should be in the amount of $580.72, the amount determined by the fiscal officers. This latter sum has been paid.

The parties have entered into a stipulation of facts. We accept their stipulation and incorporate the same herein by reference. The parties have agreed to the trial of this case without a jury, in accordance with the provisions of the Act of April 22, 1874, P. L. 109, as amended, 12 PS §688. We will discuss herein those facts which we consider of particular pertinence to the disposition of this case.

Defendant's permanent mill is located at Bradford, McKean County, Pa. The product is not of the type of lumber generally found at retail lumber yards. Approximately 95 percent of the timber cut and pro-

duced into lumber is of the hardwood species, of which approximately 65 percent is cherry, hard maple and beech. The remainder is of other hardwood species, including oak, basswood, soft maple, ash, poplar, elm and birch. Approximately five percent is of the soft species, such as pine and hemlock. The great percentage of defendant's product is sold to furniture manufacturers throughout the United States.

Defendant's professional forester marks trees to be cut according to size, species and age. After the trees are felled they are marked for length and graded according to species and size. Defects are marked for elimination. The trees are then cut into proper log lengths which are transported to defendant's mill. There they are sorted and piled according to the species of the wood. Logs of the required species are taken from the piles and passed through a "debarker", a machine having a series of flexible teeth which move from one end of the log to the other as it is rotated by an operator. In this process bark, mud, dirt, ice and snow are removed.

From the debarker the logs are moved to the sawmill carriage by a chain conveyor known as the "live deck". The sawmill carriage is a large piece of machinery that securely holds the log and enables it to be rotated by the "head sawyer". The head sawyer is a skilled operator who studies the log and makes adjustments for its repeated passage through the "bandmill" so that each cut results in the maximum thickness of the best grade of wood with minimum waste. The cuttings from the bandmill are carried away on "live rollers". Some of the cuttings need edging and they are taken off the live rollers by a mechanical device known as an "edger transfer" and carried to a machine known as an "edger". This latter machine has one stationary circular saw and two adjustable circular saws. Its operator, the "edgerman", adjusts these saws

by controls so as to cut off the rough edges with the minimum amount of waste. The edger is also used to cut the board lengthwise into two or three parts or to remove imperfections which would lower the grade of lumber.

From the edger boards are moved to a "transfer table" where edgings are taken off as waste and then moving chains carry them to the "trimmer table" and into the "trimmer". The trimmer is a machine composed of seven circular saws at 14 and 16 foot intervals which are raised or lowered by compressed air to permit the cutting of boards in maximum lengths to obtain the highest grade lumber. The trimmer operator, when necessary, raises additional saws to cut out defective parts of boards.

After passing through the trimmer the lumber falls on a "green chain" which is a conveyor type chain. Here an inspector grades and measures the lumber. After this the lumber is removed from the green chain and placed in piles according to grade and thickness in a process known as "stickering" in which cross pieces of small boards or "stickers" are placed between each level of lumber. Stickering permits the proper air-drying of the lumber. The stickered piles or packages are then moved to the mill yard where they are placed in larger piles which are "roofed" during the air-drying process. In this air-drying process moisture is removed from the lumber giving it new and superior physical qualities. After air-drying the lumber is taken off the stickers, regraded to allow for defects which may have developed and remeasured to allow for shrinkage. The resultant product, air-dried hardwood lumber, is ready for sale and delivery.

### Discussion

This court has recently had occasion to review, in connection with its decisions under the Selective Sales

and Use Tax Act, a number of authorities involving the manufacturer's exemption under the Capital Stock Tax Act. Judge Herman, in his opinion in Commonwealth v. Donovan Company, 76 Dauph. 191 (1960), has ably reviewed many of the decisions under the Capital Stock Tax Act—those holding that a particular activity constituted manufacturing and others contra. This case holds that the term "manufacture" has the same meaning in the manufacturing exclusion of the Selective Sales and Use Tax Act as in the exemption in section 21 of the Capital Stock Tax Act, supra; that the decisional law interpreting the last mentioned Act and other taxing statutes, including the various Mercantile License Tax Acts, controls the meaning of that term; that an activity is manufacturing only when a new and different product emerges; and that the hardening of metal dyes with heat and chemicals does not amount to manufacturing.

And in Commonwealth v. Erie Plating Company, 76 Dauph. 316 (1961), Sohn J., the court held that electroplating of metal objects did not amount to manufacturing. See also Judge Sohn's opinion in Commonwealth v. Joseph P. Cattie & Brothers, Inc., 77 Dauph. 41, in which it was held that galvanizing of certain metals was not manufacturing. In Commonwealth v. Wertheimer and Sons, 76 Dauph. 220 (1960), we held that fashioning cemetery monuments from raw granite was manufacturing, as did the Superior Court in Horigan v. City of Pittsburgh, 178 Pa. Superior Ct. 558 (1955). Judge Shelley, speaking for the court, in Commonwealth v. American Ice Company, 77 Dauph. 35, held that the making of artificial ice is not manufacturing. These cases contain an excellent review of the numerous authorities on this subject and we shall not attempt to repeat what has already been very well said. We conclude, however, that defendant in this sawmill is not producing a new and different product

and we will cite authorities which we feel support us in this conclusion.

In the last analysis, defendant in its sawmill operation reduces the logs to lumber, that is it cuts boards of varying sizes from the logs, dries them and sells them to furniture manufacturers. Nothing is added to make the wood any different in its composition. It is the same product in all respects, except that it is cut into smaller sizes and dried. We concede that skill is required on the part of the trained operators of defendant's machines. It is apparent also that defendant's plant functions with considerable automation that distinguishes it from the conventional sawmill that operates with the familiar buzzsaw.

The cases point out, however, that ". . . even though the labor be skilled, the operations delicate, a large plant involved, and expensive machinery utilized, such factors, neither individually nor collectively, convert what is essentially a mere processing operation into a manufacturing one: cf. Rieck-McJunkin Dairy Co. v. Pittsburgh School District, 362 Pa. 13, 23, . . .": Armour and Company v. Pittsburgh, 363 Pa. 109, 116 (1949). Bearing in mind that our concept of defendant's operation is essentially a processing rather than a manufacturing activity, and that it produces lumber of varying sizes, but does not change the quality, composition or characteristics of the wood, the Supreme Court's decision in Pittsburgh v. Electric Welding Company, 394 Pa. 60 (1958) is pertinent. Here the Supreme Court held that the shearing of steel rods to a specified length and the bending or twisting of them into desired shapes, does not constitute manufacturing.

The crushing and grinding of rock so as to produce silica sand is not manufacturing: Commonwealth v. The Welsh Mountain Mining & Kaolin Manufacturing Company, 265 Pa. 380 (1919) ; and the crushing and grinding of rock into common sand was held

not to be manufacturing in Commonwealth v. Ellwood Sand Co., 21 Dauph. 114 (1918); nor was the crushing of stone and sorting it into smaller sizes called manufacturing: Commonwealth v. The John T. Dyer Quarry Company, 250 Pa. 589 (1915). It is difficult to conceive that reducing logs to various board lengths fulfills the concept of manufacturing, whereas crushing stone for sand does not.

In Armour and Company v. Pittsburgh, supra, in enunciating the rule that the process of manufacturing brings about the production of new articles by the application of skill and labor to the original substance or material, out of which a new product emerges, the court held that the five processes there involved did not amount to manufacturing. The court, at pages 117, 118, said:

"There are four articles which the court below held to be manufactured products and which are the subject of appeals by the City and the School District, namely, lard, tallow, grease, and hides; its ruling that ice is 'manufactured' is also questioned. In our opinion, none of these products is a manufactured article. Lard is hog fat cooked in tanks under steam pressure whereby the rendered fats are drawn off to the top and separated from the water and other residue; it is then refined, bleached, mixed with a preservative ingredient, textured and packaged; sometimes it is also hydrogenated. In Commonwealth v. Fried & Reineman Packing Co., 330 Pa. 124, . . ., it was held that the production of lard consists of processing and curing operations. What has been said of lard applies also to tallow and grease, tallow being obtained from the fats of cattle and sheep; it is liquefied by rendering, and, after solidification, is classified into different grades, mainly according to color. As to hides, it has already been pointed out that in Commonwealth v. Consolidated Dressed Beef Co., 242 Pa. 163, . . ., and in Common-

wealth v. Weiland Packing Co., 292 Pa. 447, . . ., they were held not to be manufactured products; all that the packers do to the animal skins is to wash, de-hair, cure and grade them. As to ice, the process employed is to freeze water in a tank that has brine in it, the brine being chilled by ammonia contained in the coils that run through the tank. The distilling of water has been held not to be manufacturing (Commonwealth v. Sunbeam Water Co., 284 Pa. 180, . . .) and, by the same token, the mere freezing of water and converting it into ice cannot be said to be manufacturing. We are of opinion, therefore, as to the five items thus discussed, that the court below erred in holding them to be manufactured products."

See Commonwealth v. Cover, 29 Pa. Superior Ct. 409 (1905), affirmed per curiam, 215 Pa. 556 (1906), in which it was held that the cutting of sides of leather into various pieces did not constitute manufacturing, the Superior Court having held at page 412 that ". . . The defendants bring into their store from the Virginias leather and they sell leather and nothing else." See also Commonwealth v. J. Frank Boyer Plumbing and Heating Co., 30 Dist. R. 275, 277, 23 Dauph. 296, 298 (1920).

In none of the defendant's operations was there actually involved such a change as to cause a new product to emerge. When this lumber is sold, it is the same wood in all respects as when it was cut, except for the drying process. When we compare defendant's processes with the five processes considered by the Supreme Court in the Armour case, and the activities involved in these cases herein cited, we cannot reach the conclusion that defendant's activity is manufacturing. It is our considered judgment that defendant is not entitled to the manufacturer's exemption under the Capital Stock Tax Act, supra. Both parties have here cited authorities in other jurisdictions. While they are in-

formative, we do not think they are controlling, since we must here be governed by the Pennsylvania decisions interpreting our own statutes.

Defendant argues that the production of lumber has been declared to be manufacturing by statute and cites the Act of April 7, 1849, P. L. 563, 15 PS §1573 (Note), relating to the organization of corporations "for the purpose of carrying on the manufacture of woolen, cotton, flax or silk goods, and of iron, paper, lumber or salt in this commonwealth." And the defendant suggests that similar provisions concerning the manufacture of lumber are found in the Act of April 20, 1853, P. L. 637, 15 PS §1573 (Note). Defendant argues that in Commonwealth v. Northern Electric Light and Power Co., 145 Pa. 105 (1891), the Supreme Court held that such statutory classification entitled the manufacturing companies therein designated to exemption under the Act of June 30, 1885, P. L. 193. However, in Commonwealth ex rel. McCormick v. Keystone Electric Light, Heat and Power Company, 193 Pa. 245 (1899), the Supreme Court said at pages 250-251:

"The ground on which the decision [in the Northern Electric Light Co. case] is said to rest, the definition of manufacturing companies adopted by the legislature, will not bear the test of the act of 1874 in the light of later decisions, or of the legislative interpretations of the earlier act by more recent ones which are in pari materia . . .

". . . The reason assigned for the decision in Commonwealth v. Northern Electric Light Co., however, is not satisfactory."

The Supreme Court made in part the same observation with respect to the Northern Electric Light Company case in Commonwealth v. American Car and Foundry Company, 203 Pa. 302 (1902). We do not

believe the statutory use of the term "lumber" authorizing the formation of companies, inter alia, "for the purpose of carrying on the manufacture of . . . lumber" in 1849 controls later statutes on this subject pertaining to the formation of corporations and the great body of decisional law interpreting later taxing statutes granting manufacturing exemptions.

Neither party presented any requests for findings of fact or conclusions of law. For all of these reasons, we therefore enter the following

### Order

And now, July 24, 1961, judgment is herewith entered in favor of plaintiff and against defendant in the sum of $580.72, unless exceptions are filed within 30 days from the date hereof. This sum having been paid, if no exceptions are filed, the judgment shall be marked satisfied upon payment of the costs.