Kirks Milk Products, Inc., Petitioner *v.* Commonwealth of Pennsylvania, Respondent.

Argued December 9, 1980, before President Judge CRUMLISH and Judges WILKINSON, JR., MENCER, ROGERS, CRAIG, WILLIAMS, JR. and PALLADINO. Judges BLATT and MACPHAIL did not participate.

*Sherill T. Moyer,* with him *Frank A. Sinon, Rhoads, Sinon & Hendershot,* for petitioner.

*Robert Patrick Coyne,* Deputy Attorney General, for respondent.

OPINION BY PRESIDENT JUDGE CRUMLISH, April 3, 1981:

Kirks Milk Products, Inc., appeals from a Board of Revenue and Finance determination that the production of skim milk powder and buttermilk powder does

not constitute "manufacturing"[1] or "processing"[2] within the capital stock tax exemption. We reverse.

The stipulated facts follow: Kirks Milk Products, Inc. (Taxpayer) is a Pennsylvania corporation engaged in the storage, production, and wholesale-retail purchase and sale of milk, cream, butter, cheese and, for our purposes, buttermilk powder and skim milk powder. The taxpayer's total *powdered* dairy products output, approximately 91% powdered skim milk and 9% powdered buttermilk, is sold at wholesale and constitutes $566,008 and $54,041, respectively, of

---

[1] Section 602(a) of the Tax Reform Code of 1971, Act of March 4, 1971, P.L. 6, *as amended*, 72 P.S. §7602(a), provides in pertinent part:

(a) That every domestic corporation ... shall be subject to, and pay into the treasury of the Commonwealth annually, through the Department of Revenue, a tax at the rate of ten mills, upon each dollar of the actual value of its whole capital stock of all kinds.... *Provided, That the provisions of this section shall not apply to the taxation of the capital stock of corporations, limited partnerships and joint-stock associations organized for manufacturing, processing, research or development purposes*, which is invested in and actually and exclusively employed in carrying on manufacturing, processing, research or development within the State.... (Emphasis added.)

[2] Section 602(c)(7), 72 P.S. §7602(c)(7), specifically provides a "processing" exemption to the capital stock tax:

(c) The term processing, as used in this section, shall mean and be limited to the following activities when engaged in as a business enterprise:

....

(7) The production, processing and bottling of nonalcoholic beverages for wholesale distribution.

The exemption did much to alleviate the restrictive interpretation which had been placed upon "manufacturing" specifically relative to milk products. *See Rieck-McJunkin Dairy Co. v. Pittsburgh School District*, 362 Pa. 13, 66 A.2d 295 (1949).

$1,763,880 in total gross receipts[3] for the tax period, November 1, 1973 through October 31, 1974.

Filing its Capital Stock Tax Report to reflect tax liability of $207.11, taxpayer asserted that buttermilk and skim milk powders were produced through "manufacturing," concluded that receipts therefrom were derived from the use of exempt assets, and reported its tax liability based only upon its non-manufacturing gross receipts or the raw milk purchased and resold at wholesale. However, the Department of Revenue settled the capital stock tax liability in the amount of $1,201.48 by denying exempt status for certain assets and adding in gross receipts for skim milk powder, buttermilk powder, and cream to taxable assets.

Since the sole question involved in this case is whether Taxpayer's production of buttermilk powder and skim milk powder constitutes "processing" or "manufacturing" for purposes of exemption under Article VI of the Tax Reform Code of 1971, a discussion of the legal background will be followed by a detailed review of the production process.[4]

---

[3] Taxpayer's total gross receipts of $1,763,880 during the taxable period were derived from the sale of raw milk purchased and resold at wholesale ($315,892), cream ($123,698), butter ($175,161) and cheese ($529,080), buttermilk powder ($54,041) and skim milk powder ($566,008).

[4] For background purposes, we note that the exempt "processing" of separated and pasteurized liquid cream and skim milk occurs in two stages. In the initial stage of production, the "separation phase," raw whole milk is heated in large tanks, pumped into a continuous centrifuge, and separated into its constitutent parts—liquid skim milk and liquid cream. The second stage or "pasteurization phase" finds both the milk and cream heated under controlled conditions in a pasteurizer in order to retard the fermentation of milk sugars, prevent the formation of toxic substances, and generally destroy harmful bacteria.

*Discussion*

For nearly 100 years, the assets of Pennsylvania corporations engaged in manufacturing have enjoyed an exemption from capital stock taxation. *See Norris Brothers v. The Commonwealth*, 27 Pa. 494 (1856). More recently, our Supreme Court in *Commonwealth v. Deitch Co.*, 449 Pa. 88, 94, 295 A.2d 834, 838 (1972), expressed the purpose of the manufacturing exemption as created "to establish a favorable climate in Pennsylvania for manufacturers and thus encourage the development of industry. Additionally, there was a desire not to put domestic manufacturers at a competitive disadvantage with out of state industries[,]" who enjoyed tax exempt status in their adjoining home states. *And see Commonwealth v. Northern Electric Light and Power Co.*, 145 Pa. 105, 120, 22 A. 839, 841 (1891).

Since the tax laws fail to provide definitional guidelines, the judicial meaning and the corresponding practical interpretation of the term "manufacturing" becomes most important. In *Armour and Co. v. Pittsburgh*, 363 Pa. 109, 116, 69 A.2d 405, 408-09 (1949), our Supreme Court summarized business activities which qualify for the exemption:

------

The pasteurized cream is then utilized to produce butter and buttermilk through a third stage, an agitation or "churning process." Here, liquid cream containing 30% to 33% butter fat is placed in a low temperature mechanical churn and rotated until the "breaking point" is reached and butter "granules" are formed. This production of butter indisputably constitutes "manufacturing" within the scope of the capital stock tax exemption. However, the remaining liquid, a by-product of butter production, is drawn off and subsequently used in the production of buttermilk powder.

Taxpayer's entire production of liquid buttermilk and skim milk is then completely utilized in the production of buttermilk and skim milk powders.

It was said in Commonwealth v. Weiland Packing Co., 292 Pa. 447, 450, 451, 141 A. 148, 149, that 'the process of manufacture brings about the production of some new article by the application of skill and labor to the original substance or material out of which such new product emerges. If however there is merely a superficial change in the original materials or substances and no substantial and well signalized transformation in form, qualities and adaptability in use, quite different from the originals, it cannot properly and with reason be held that a new article or object has emerged — a new production been created.' Nor is it of legal significance in this connection that the operations thus conducted require large and extensive plants and organizations, trained men and intricate machinery, for even though the labor be skilled, the operations delicate, a large plant involved, and expensive machinery utilized, such factors, neither individually nor collectively, convert what is essentially a mere processing operation into a manufacturing one: cf. Rieck-McJunkin Dairy Co. v. Pittsburgh School District, 362 Pa. 13, 23, 66 A.2d 295, 299.

Over the years, our courts have not only been consistent in narrowly defining the term "manufacture", but reluctant to grant the manufacturing exemption with respect to operations performed by taxpayers in the production of foods. Early on our Supreme Court held that the purchase, slaughter, cleaning, washing, sorting and resale of meat, hides, heads, and horns was not manufacturing within the capital stock tax exemption. *Commonwealth v. Consolidated Dressed Beef Co.*, 242 Pa. 163, 88 A. 975 (1913). *See also Commonwealth v. Weiland Packing Co.*, 292 Pa. 447, 141

A. 148 (1928), where "manufacturing" status was denied pickled and dry salt pork, smoked hams and other pressed meat products.

A number of years later, the Supreme Court addressed the "manufacturing" status of milk products. In *Rieck-McJunkin Dairy Co. v. Pittsburgh School District*, 362 Pa. 13, 66 A.2d 295 (1949), the milk dealers' status as "manufacturers" under the mercantile tax exemption was questioned with respect to the production of pasteurized and homogenized milk and cream, butter, pasteurized cultured buttermilk, pasteurized skimmed milk, and our subject, skimmed milk powder. Classifying the milk dealers as manufacturers with respect to making ice cream, cottage cheese, and butter, our Supreme Court held that "[w]hile these articles are made from milk, they are 'a new and different article' from the milk originally purchased," but concluded that "[c]ondensed, evaporated and powdered milks are produced by boiling off, under controlled conditions, a portion of the water content of the milk; this is a variation of the process of reducing a raw material to its constituent parts for purposes of distribution." *Id.* at 22-23, 66 A.2d at 299.

However, certain methods of food production have fared well. In *Commonwealth v. Snyder's Bakery*, 348 Pa. 308, 35 A.2d 260 (1944), the taxpayer's production of potato chips from raw whole potatoes, hot fat, vegetable oils, and salt constituted "manufacturing" for mercantile license tax purposes. The Court held that the manufacture of potato chips, consisting of storing raw potatoes at a given temprature for a specified period, testing, storing at increased temperature, cleaning, slicing, washing, drying, immersing in hot fat and vegetable oils, draining and drying, and salting and packaging, resulted in a product adapted to an entirely different use from the raw potato, the form and content of the finished product being entirely different.

In *Pillsbury Mills, Inc. v. Pittsburgh School District*, 408 Pa. 369, 372, 184 A.2d 236, 237 (1962), the milling of wheat into flour was held to be "manufacturing" for mercantile license tax purposes — "an intricate technologically sophisticated process.... The milling operation includes the grinding, blending and processing of the many types of wheat into flour of varying characteristics which will be used for countless purposes."

Even in the case of *Commonwealth v. Berlo Vending Co.*, 415 Pa. 101, 105-06, 202 A.2d 94, 96 (1964), where the production of popcorn was denied manufacturing status for franchise tax exemption purposes, the Supreme Court after discussion drew an important distinction:

[T]he production of popcorn, even though on an expanded scale, should not achieve the status of manufacturing as that term is popularly considered. The popping of corn does not require any specific skill or elaborate machinery. It can be done in the home by a child in a smaller scope in the same manner as appellant accomplishes in its plant. There is no application of labor, skill, art or science to provide a well signalized change as those terms are known. There can be little doubt that the courts have required a certain degree of skill, art or science be employed.

....

While the Court below expressed doubt as to the current validity of the Snyder's Bakery case, we need express no view as to that observation. *It is quite clear that the production of popcorn involves far less control factors, skill and science* than does the production of potato chips. (Footnote omitted.) (Emphasis added.)

Consequently, we must examine the production methods used for both buttermilk and skim milk powders, and ascertain first, that a high degree of skill, science and labor has been applied to the liquid buttermilk and skim milk, and second, that a substantial transformation in form, qualities and adaptability in use has made the powdered milk a new, different and useful article.

Aside from arguing that the taxpayer's operation does not constitute "processing" within that added statutory exemption, the Commonwealth contends that the simple extraction of water has neither popularly nor judicially been regarded as manufacturing. *See Rieck-McJunkin Dairy Co. v. Pittsburgh School District, supra* (milk products); *Commonwealth v. Glendora Products Co.*, 297 Pa. 305, 146 A. 896 (1929) (roasting coffee); and *Commonwealth v. Babcock Lumber Co.*, 1 Pa. Commonwealth Ct. 45, 272 A.2d 522 (1971) (kiln drying pre-cut green lumber). While the production of powdered milk is clearly not "processing" within the exemption, we must disagree with the Commonwealth's "manufacturing" position.

In the *Rieck-McJunkin* case, our Supreme Court seems to have had no informed opportunity to examine evidence regarding either the taxpayer's machinery or production methods or the distinctive characteristics of the subject powdered milk. Although evidence was produced by the taxpayer, the chancellor made no findings of fact with respect to the taxpayer's production methods. In addition, the *Rieck-McJunkin* decision has lost much of its impact upon milk products in light of the recent processing exemption to the capital stock tax. As for *Glendora Products, supra*, and *Babcock Lumber, supra*, the manufacturing process before us goes far beyond roasting coffee and drying out lumber.

## A. *Skill, Science and Labor*

Taxpayer utilizes an elaborate "Lo-Temp" evaporation system with a three-cycle process, identified by refrigeration, product, and spray drying stages, in the production of buttermilk and skim milk powders.

Operating on the evaporation principle, the initial "refrigeration" cycle removes water from the milk by using two vacuum chambers through which tubes carrying pressurized ammonia vapors act as a heating agent. These "first effect" and "second effect" chambers work hand in hand to create a condensed or concentrated, but still liquid, buttermilk or skim milk product. In the "first effect" chamber, since the milk is vacuum heated over the ammonia vapor tubes, evaporation of the water content occurs at a relatively low temperature. The water vapor extracted from milk in the "first effect" chamber is then utilized as the heating agent in the "second effect" chamber, where the milk product is heated to a higher temperature under a vacuum and is concentrated or condensed still further as additional water is removed by evaporation.

In the second or "product" cycle of the Lo-Temp system, partially concentrated liquid buttermilk or skim milk products from the "second effect" chamber are pumped back into the "first effect" chamber. As the product flows down the tubes of the "first effect" chamber, its temperature is increased to between 165°F/73.9°C and 185°F/85°C, and additional water is removed by evaporation and pumped off by a condensate pump. Completion of this "product" cycle leaves a product which contains 42% to 48% milk solids by volume. Attendant are various physical and extremely complicated chemical changes in the liquid skim milk and liquid buttermilk as a result of the heating and concentration which took place during the "refrigeration" and "product" cycles. Serum proteins and caseins are denatured, the acidity of the product

changes due to changes in chemical salt balances, the "heat stability" of the product is increased, and the product becomes increasingly viscous or "sticky."

The final stage of skim and buttermilk powder production is identified as the "Spray Drying" Cycle. The heated and concentrated product is forced at high pressure through an atomizing nozzle located at the top of a precipitating chamber. The atomized particles or droplets are exposed to a controlled air flow heated by a direct fired furnace, and upon reaching a temperature of 185°F/85°C, instantly release their remaining water content in the form of vapor. Dry buttermilk or skim milk particles, separate from but mixed with water vapor, pass into the primary collector where they are separated by "cyclonic" action. The powder is further cooled by air as it passes progressively through secondary and final production collectors and is finally sifted and placed in sealed containers.

Surely, that degree of skill, science and labor which "manufactured" potato chips in *Snyder's Bakery* and flour in *Pillsbury Mills* can be attributed to the elaborate Lo-Temp evaporation system's three cycle production of buttermilk and skim milk powders.

### B. *New, Different and Useful Product*

Addressing the second prong of the "manufacturing" test, we conclude that the resulting buttermilk and skim milk powders are new and useful products, substantially different in form, qualities and adaptability in use. In "form," the conversion from liquid to crystalline or solid is obvious. In terms of "qualities" and "adaptability in use," the record and stipulated facts speak for themselves. Aside from the "lactose" or crystalline reaction and the "browning" or chemical heat reactions, the resulting powders have almost indefinite "keeping" qualities, none of the coagulent, curding or enzyme properties, increased blending abili-

ty and greater flavor stability than do either buttermilk or skim milk. The principal commercial uses of buttermilk and skim milk powder are as ingredients in special dried foods and prepared dry mixes such as dry cake or biscuit mixes, dry soup mixes, prepared dry cereals, dry infant formulas and prepared dry dog and other animal foods, where it is not possible to use the liquid milks. Buttermilk and skim milk products are used extensively in the baking and confection industries as ingredients because of their unique ability to blend with sugar and cane syrups and flavorings at high processing temperatures without coagulating or resulting in undesirable flavor characteristics. Liquid milks have been found commercially infeasible because of such undesirable characteristics as flavor changes, inability to withstand the high cooking temperatures, required coagulation or curding and the inability to produce a smooth viscous mixture of the candy product. Buttermilk and skim milk powders are also used extensively in virtually all areas of the prepared food industry in products such as canned or frozen soups, frozen dinners, frozen casseroles, meat sausages, canned meats, and canned gravies and sauces because of their superior "keeping" characteristics, blending characteristics and flavor stability. In addition, aside from general use in the production of glue and adhesive materials, the powdered milks may be "reconstituted" and used as a beverage for human consumption with characteristics quite different from their liquid counterparts.

Having determined that taxpayer is entitled to the capital stock tax's manfacturing exemption for the fiscal year ending October 31, 1974, we reverse the decision and order of the Board of Finance and Revenue, and enter judgment in accordance with Stipulation of Fact 41 in favor of the Commonwealth and against taxpayer in the amount of $207.11. The

judgment shall be marked "satisfied" upon payment of docket costs by taxpayer and a credit of $994.37 shall be entered in favor of taxpayer on the proper books and records of the Department of Revenue.

Reversed.

ORDER

The Board of Finance and Revenue order, dated July 30, 1976, Board Docket No. R-1610, is hereby reversed, and judgment is directed to be entered in accordance with Stipulation of Fact 41 in favor of the Commonwealth and against Kirks Milk Products, Inc. in the amount of $207.11. The judgment shall be marked "satisfied" upon payment of docket costs by taxpayer and a credit of $994.37 shall be entered in favor of taxpayer on the proper books and records of the Department of Revenue unless exceptions are filed hereto within thirty [30] days.

Judges WILKINSON, JR. and ROGERS dissent.

This decision was reached prior to the expiration of the term of Judge WILKINSON, JR.